THE STATE v. BART DAVIT, Appellant.—125 S. W. (2d) 47.

Division Two, February 21, 1939.

*Joseph A. Falzone, O. F. Underwood* and *J. Cordes Delworth* for appellant.

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

ELLISON, J.— The appellant was convicted of murder in the first degree for shooting and killing Paul Flueck in St. Louis County

and his punishment fixed by the jury at life imprisonment in the penitentiary. His motion for new trial in the circuit court contained thirty-two assignments of error. The Attorney General's brief filed in this court last April covers all of these. The appellant's brief was not filed here until more than six months later in October. The Assignment of Errors therein lists fifteen assignments but of these only four are covered by his Points and Authorities and Argument. In view of the fact that he had ample time to answer the Attorney General's discussion of the others but failed to do so, we treat them as abandoned, with the further observation that we have examined the record proper and find no error therein. We do this for the reasons stated in State v. Mason, 339 Mo. 874, 98 S. W. (2d) 574, and State v. Huett, 340 Mo. 934, 104 S. W. (2d) 252.

On the evening of February 20, 1932, the deceased Paul Flueck was behind the counter in his small grocery and meat market in Maplewood in St. Louis County. His wife, Mrs. Theresa Flueck, and a clerk, William Hollingsworth, were with him. In front of the counter were his daughter, Mrs. Pauline Davidson and a customer, Mrs. E. C. Dillman. A man entered the store with a pistol in his hand and said: "Stick up your hands, and don't go for a gun." The deceased ducked behind the counter and, crouching, went back to his desk, got a revolver, and was returning toward the robber when the latter amidst the screams of the women fired one shot, killing him, and went back out the door. It was all over in a few seconds.

Hollingsworth, the clerk, sought refuge behind the counter most of the time and was watching the movements of his boss, the deceased. He testified he noticed the robber was a man of medium height and that his pistol was dark or blue, but he swore he did not see the robber's face and could not identify the appellant as the man. Mrs. Dillman, the customer, was near the door, about to leave the store, when the robber came in. She retreated to a corner, got behind a show case other witnesses say, and in the confusion and excitement didn't see much more. The robber appeared to her to be a rather small man, but was in a stooped position. His eyes were blue.

Mrs. Davidson, daughter of the deceased, testified that when the latter returned from his desk with his revolver, and his head came up in sight from behind the counter, the robber stepped close behind her and she heard a shot fired. She declared she got a good look at the man and his face. He had on a green slicker over a gray suit, with the collar pulled tight about him and a white and black muffler around his neck. He wore a gray hat. She had identified him in a police show-up in 1934. Being asked if she saw the robber in the court room, the witness answered in the affirmative, indicated the appellant sitting behind his counsel and referred to his nervous looking eyes. She said, "I will never forget him," declared she was positive in her identification, and wept.

The testimony of Mrs. Theresa Flueck, widow of the deceased, generally coincided with that of the other witnesses concerning the movements of the parties in the store, but varied a little as to the exact language they used. She was positive in her identification of the appellant as the robber. She said:

"He had a gray hat on, a gray suit, with a green slicker, and a white muffler, with black lines, with fringes on it, and I took a good look at him, and he had his blue steel gun up against his side like that, and his eyes I will never forget, and he was trembling—His eyes, and he looked at me, and Bill Hollingsworth fell down, and he stood there, and I wanted to have a good description. I took a good look at that time and as he seen me looking at him he took his coat and closed up his collar like that." The witness went on to say she identified appellant in a police show-up in Clayton, the county seat, in August, 1934, two and a half years after the homicide; that she heard him speak there, recognized his face, and that his manners, eyes and nervousness were the same. She was subjected to a lengthy cross-examination in which she reiterated she was positive in her identification. This cross-examination indicates her description of the robber at the trial in October, 1935, was more detailed than that given in her testimony at the coroner's inquest two days after the homicide, and differed from it in some respects.

The appellant's defense was an alibi. He testified that he left St. Louis County on the *morning* of February 20, 1932, the day of the homicide, and drove to Sedalia, Missouri, where he stopped for nearly an hour negotiating the sale of some alcohol to a man named Sappington. Thence he drove to Kansas City, registered at the Midwest Hotel, and went in a taxi to the Blue Hills Country Club where he made another sale. He remained at the Midwest Hotel that night, purchased a box of candy the next morning as a birthday gift for his mother, and drove back through Sedalia to St. Louis. At Sedalia he stopped before noon to see the Sappingtons again, and arrived in St. Louis in time for his mother's birthday dinner, which he attended with his wife and children.

He identified as his own the signature of his name on a hotel register sheet of the Midwest Hotel in Kansas City, and wrote his name at the trial on a piece of paper which was submitted to the jury along with his signature on several court papers, for comparison with the registration sheet. The owner of the hotel, G. C. Nitzsche, identified the sheet as one made in the usual course of business on February 19 and 20, 1932. Mr. and Mrs. Sappington and Earl Sappington all testified the appellant passed through Sedalia early in the afternoon of February 20, and the late morning of February 21, 1932. The appellant's wife stated he left home before noon on February 20 for Kansas City and returned at about six o'clock in the evening on the

next day, and then attended his mother's birthday dinner. Appellant's father swore appellant was at the birthday dinner and brought his mother a box of candy. The appellant denied committing the homicide or being present when it was committed; and also denied that he ever had a green raincoat, light gray Fedora hat or muffler.

■ Appellant's first briefed assignment is that the verdict was unsupported by credible evidence and was the result of passion and prejudice. His counsel argue the evidence for the State was so weak and his alibi evidence so strong that we must as a matter of law infer the jury were dominated by emotion, passion and prejudice. It was held in State v. Gregory, 339 Mo. 133, 143-4, 96 S. W. (2d) 47, 53, that such a contention merely means the evidence alone was insufficient to support the verdict. In other words, when we infer passion and prejudice from the verdict, itself, it is because we are unable to find justification therefor in the evidence standing alone. There can be no question about the fact that the State's evidence was substantial, and made a case for the jury. The proof of the homicide was ample and undisputed. The controverted question was, who committed it. The wife and daughter of the deceased testified as eyewitnesses that appellant was the guilty man. Their evidence identifying him was positive. They described his clothing and especially noted his nervous, twitching blue eyes. Both had recognized him in a police show-up in the summer of 1934.

It is true the testimony of these two women did not coincide in all details. And the testimony of the widow, Mrs. Theresa Flueck, at the coroner's inquest differed somewhat from her testimony at the trial. On the former occasion she described the robber (then unknown) as a young man wearing a gray fedora hat, and with a belt over his coat. At the trial she and her daughter said the robber was wearing a gray hat, gray suit, and a green slicker. But the coroner's inquest was concerned with the cause of death, not so much with the identification of the murderer, and this line of questioning was brief and superficial. It is true also that the arrival of the robber, the shooting and his departure all occurred within a few seconds; and that two of the persons present, Mr. Hollingsworth and Mrs. Dillman, through fright and in efforts to protect themselves, failed mentally to record his appearance so they could identify him. But Mrs. Flueck and Mrs. Davidson say they did, and it is not unnatural that they should have, because of their greater interest in the disastrous event wherein the victim was the husband of one and the father of the other.

The alibi testimony for appellant was strong, but depended on the veracity of the witnesses who gave it. Two of them were the appellant's wife and father, and W. B. Sappington was evidently engaged in (then) illegal traffic in intoxicating liquor. The only physical evidence tending to show appellant was not in St. Louis County when

Paul Flueck was murdered, was the register sheet of the Midwest Hotel in Kansas City bearing appellant's alleged signature. But the authenticity of these in turn depended on the testimony of appellant and the hotel manager. We think the evidence for the State was substantial in the sense that reasonable minded jurors might have found him guilty thereon. [State v. Gregory, supra, 339 Mo. 1. c. 143, 96 S. W. (2d) 1. c. 53; State v. Fitzsimmons, 338 Mo. 230, 232-3, 89 S. W. (2d) 670, 671; State v. Bagby, 338 Mo. 951, 961, 93 S. W. (2d) 241, 247; State v. Scobee, 331 Mo. 217, 227, 53 S. W. (2d) 245, 250; State v. Blackmore, 327 Mo. 708, 715, 38 S. W. (2d) 32, 34.]

■ The next assignment complains of prejudicial cross-examination of the appellant by the prosecuting attorney. As already stated the appellant testified that on February 20, 1932, he was on a trip to Sedalia and Kansas City at the hour when Paul Flueck was murdered. He fixed the date of this trip by the registration sheet of the Midwest Hotel in Kansas City and the fact that he returned to St. Louis just in time to attend his mother's birthday dinner on the evening of February 21. The prosecuting attorney cross-examined appellant about his recollection of these dates and to test his memory asked him if he could remember where he was on the corresponding dates in 1931 and 1933. Then, for the same purpose, according to the prosecuting attorney's explanation in open court, he asked the appellant the questions set out below over insistent objections by appellant's counsel that the answers called for would be irrelevant and immaterial and that the real purpose of the inquiry was to inject into the jury's minds extraneous facts which were incompetent and prejudicial. The questions and answers were as follows:

"Q. How long has Mr. Lacy been representing you? A. Ever since this case started.

"Q. Not until then? You mean that he has not represented you prior to hiring him in this case? Is that right? A. I know Mr. Lacy, surely.

"Q. Did he ever represent you before this? You say he never represented you until. . . . Did he ever represent you before you were arrested on this charge? A. Sometimes I would stop in to see him about legal matters.

"Q. He was your attorney back in 1932, wasn't he? In May of 1932? Did he represent you in May, 1932? A. Yes, sir.

"Q. And prior to that? A. Yes, sir."

Mr. Lacy does not represent appellant on this appeal, and we know from a verified motion filed in the cause that he died in January of this year. Speaking of the above line of questions appellant's present counsel say in their brief:

"State's counsel had only one purpose in mind, in asking these immaterial and incompetent questions, and that was to convey to the

**1158**

jury that appellant had employed Verne Lacy on numerous occasions before the present case developed, Verne Lacy being a well known trial lawyer of criminal cases, and who had gained great publicity just several weeks before this trial in trying the well-known State v. Felix Francis McDonald case. This no doubt also prompted the prosecutor to ask the appellant the incompetent and irrelevant question: '. . . Do you know Felix Francis McDonald?'

''The astute prosecutor had just a few weeks before gained nation-wide, front page publicity in having something to do with the conviction of McDonald, who was one of the defendants in the famous 'Kelley kidnaping case,' and who was sentenced to sixty years in the State penitentiary. There is little doubt in the mind of appellant that the prosecutor, in asking the question of appellant's knowledge of McDonald, had hoped the jurors would remember the McDonald case and thereby become poisoned against this appellant.''

We are inclined to agree that the matter of how long Mr. Lacy had represented appellant was irrelevant and immaterial. Neither was an inquiry into it a legitimate test of appellant's memory. But we are constrained to hold the assignment made here is not well founded for two reasons. First, we cannot take judicial notice of the facts stated in appellant's brief, and no such objection was made at the trial. It is true appellant's counsel there made the vague objection that the evidence called for was calculated to poison the jury's minds by directing their attention to extraneous matters not connected with the appellant and the case; but the trial court was not advised in any way as to how the questions would have that effect. If counsel for appellant did not want to make the objection more specifically in the presence of the jury they could have put the objection in the record and made an offer of proof outside the jury's hearing.

Further, it is our view that a defendant who voluntarily employs a lawyer in a case vouches for him, especially where the lawyer's reputation is a matter of public knowledge, as appellant's brief says it was in this instance. It is counsel's theory that Mr. Lacy was a well known trial lawyer in criminal cases, who had gained great publicity a few weeks before in the trial of the Felix Francis McDonald case. If appellant desired to avail himself of the services of Mr. Lacy because of the latter's skill in criminal trials, it hardly lies in his mouth to complain that reference to such employment was injurious to his cause. If there was any poison in that it was self-administered, because appellant had brought Lacy before the jury as his defender, and in his brief asks us to infer the jury knew Lacy's reputation as a criminal lawyer, and of his connection with the McDonald case. If we could draw that inference there might be something in appellant's contention that it was error to permit the prosecuting attorney to elicit the fact on cross-examination that appellant had Lacy employed

back in 1932 about the time of the commission of the homicide here involved, and even before that. But as we say, we cannot draw that inference or take judicial notice of Lacy's professional reputation, and there was no offer to prove it. Apparently the contention now made did not occur to appellant's counsel at the trial, for when the prosecuting attorney asked appellant the question referred to in the foregoing excerpt from appellant's brief: "Do you know Felix Francis McDonald?" no objection was made. And no objection was made at the trial on the ground that the foregoing questions went outside the scope of the direct examination in violation of Section 3692, Revised Statutes 1929 (Mo. Stat. Ann., p. 3242). This assignment is ruled against appellant.

Other questions on cross-examination complained of in the brief are stated next. The widow, Theresa Flueck, on direct examination admitted she had stated "at the hearing over here" (what hearing she meant we do not know) that the appellant had a pale face. But she denied she had said appellant had a pale face at the time of the robbery. Nevertheless, appellant's counsel assumed she did say that, and in rebuttal introduced testimony that he had a ruddy complexion in 1932, and accounted for his pallor at the trial by proving he had been continuously confined in jail for nineteen months. The prosecuting attorney objected to that as immaterial "unless we can go into the confinement and all the features of it and explain it," but the objection was overruled.

On cross-examination appellant was asked: "You say you had been in jail for nineteen months; when were you arrested on this charge, do you know?" Appellant countered with the question "The charge I am on trial for now, Mr. Anderson?" Being answered in the affirmative he said he had been in jail from March until July, 1934, when he was charged with the murder, and as we understand the record was kept in jail thereafter until the trial in October, 1935. Then the prosecutor inquired. "Now, have you ever announced, or your lawyer announced, you were ready for trial before today on this charge *or any other charge?*" (*Italics are appellant's*) Appellant's counsel strenuously objected to the question by calling for an irrelevant and incompetent answer; also that the record would be the best evidence. The prosecutor said the purpose of the question was to satisfy the jury's minds as to why appellant had been kept in jail. The objection was overruled and the appellant answered that his counsel, Mr. Lacy, took charge of his case and he left that matter to him.

We think the question as to *why* appellant was kept in jail so long was immaterial, especially since this whole line of questioning was based on the false premise that Mrs. Flueck had stated appellant had a pale face when he committed the homicide. But the prosecutor felt

that one of the purposes of appellant's counsel in showing he had been confined in jail continuously for nineteen months, was to leave an inference with the jury that appellant had been harshly dealt with by the State. It was a collateral inquiry but not, in our opinion, substantially prejudicial to appellant. The objectionable part of the question here emphasized by appellant was that the prosecutor asked appellant whether he had been ready for trial "on this charge *or any other charge?*" But it must be remembered appellant just before that had asked the prosecutor the counter question whether he meant "the charge I am on trial for now." And appellant's objection at the trial did not go to the prosecutor's reference to some other charge. Furthermore, on redirect examination appellant was permitted to testify that he had never in his life been convicted of any crime, and that testimony remained undisputed throughout the rest of the trial. We find no reversible error here.

On direct examination appellant had identified a paper filed in the cause bearing his signature, and the latter was used for comparison with his signature on the register of the Midwest Hotel in Kansas City. On cross-examination the prosecutor was asking the appellant about that paper. It was a petition in *habeas corpus ad testificandum* to bring in a witness George McCarthy, and was verified by the affidavit of appellant. Appellant declared he didn't know what the paper was for, and that he didn't know "the legal word you use for it." Then the prosecutor asked him, "You appreciate an oath, don't you?" and the appellant answered, "Surely." After appellant had thus answered, his counsel asked that the prosecutor be reprimanded because the question was "insulting and is not proper procedure," and the request was denied. We hold the question and ruling do not call for a reversal.

The appellant stated on cross-examination, that he had never seen Mrs. Theresa Flueck, the widow, and Mrs. Pauline Davidson, the daughter, of the deceased until they identified him at the police show-up in the summer of 1934, and that he had never had a quarrel with them. Immediately following that the prosecutor asked this question: "Can you tell this jury why they would come in here—." This question is assigned as error in the brief, but on reference to the bill of exceptions we find an objection to the question was sustained at the trial, and it was never answered.

The next assignment of error sets out thirteen questions asked by the prosecutor on cross-examination of appellant, which it is claimed were outside the scope of the direct examination, and therefore violative of Section 3692, Revised Statutes 1929 (Mo. Stat. Ann., p. 3242). The appellant had testified on direct examination as to his height, weight and whereabouts on the day and hour of the murder. On cross-examination he was asked if he knew what his height and

weight were the year before that, 1931, and where he was on two specified dates of that year. This was to test the accuracy of his testimony and memory on the corresponding facts stated on direct examination, and not for the purpose of proving the truth of the facts inquired about on cross-examination. The cross-examination was, therefore, within the scope of the direct examination, and did not violate the statute. The trial court had a discretionary right to control the length of the cross-examination and we do not find that that discretion was abused.

Three of the thirteen questions listed in the above assignment, concerning George McCarthy and his confinement in jail with appellant, were not objected to until after the last one had been answered, and when that objection was made it was sustained. So we need not consider them further. Another question was, "I will show you this paper. Do you know what it is?" The paper referred to was the petition in *habeas corpus ad testificandum* introduced on direct examination of appellant, as already stated. For this reason it is apparent at once that the question was not open to the objection here urged, that it was outside the direct examination. An objection was promptly sustained to the question, "Have you ever been falsely accused before?" And we have already ruled on the last two questions listed, as to how long Mr. Lacy had been representing appellant. This disposes of all these assignments.

Strenuous objection is made to the closing argument of the prosecuting attorney, during which he referred to appellant's counsel as Dr. Lacy, the old medicine man, and accused him of going to Kansas City to establish appellant's alibi—so far away that the State couldn't check it. The prosecutor went on to say: "I will say they frame alibis; they doctor alibis; and I say, Mr. Lacy, you framed this alibi, and you know it." But during this argument and in the face of these accusations Mr. Lacy sat mute and made no objection of any kind. Then the prosecutor referred to W. B. Sappington, who had testified that the appellant passed through Sedalia the day of and the day after the homicide; mentioned his connection with the then outlawed liquor traffic; and said he had lied to save his pal—the appellant. "But" the prosecutor added, "you couldn't put him near nine o'clock"—this being the hour of the homicide. Continuing, the prosecutor said: "Adroit, running, slick, sly, Dr. Lacy, the old medicine man, couldn't get him that close to nine o'clock." Then for the first time appellant's counsel, Mr. Lacy, objected, saying: "Your Honor, I ask the court to protect me in counsel's reference to me. It is degrading and it is insulting, and I object to it. I think it is contemptible, and the product of a mind like Mr. Anderson has." The prosecutor rejoined that the court did not protect the witnesses for the State when Lacy denounced them in his argument, and also said he

had permitted Lacy to make his argument without objection or interruption or objection. The objection was overruled. Lacy's argument is not preserved in the record brought here by the appellant.

In ordinary circumstances we would reverse and remand the cause for this argument alone. For the sake of the dignity of the court, if nothing else, counsel ought to have been curbed, if he would not restrain himself. Conceding for the sake of argument that the foul odors of this case arose from a criminal cesspool, that is no reason why they should be permitted to permeate the courtroom. But the trial is done. The question now before us is one of reversible error affecting the rights of the appellant. When the prosecutor made his nauseating charges appellant's counsel sat silent. The prosecutor had a right to argue from the record, within the bounds of professional decorum, that the alibi testimony was false. He was suffered to go on without objection or restraint until after the most vituperative part of the argument had been made. It appears from the record that both sides were allowed the widest latitude. We do not know what appellant's counsel said in their argument. In this situation we cannot hold the argument was reversible.

This disposes of all the briefed assignments. Looking at the case as a whole we can only say what we said recently in another case, State v. Richetti, 342 Mo. 1015, 119 S. W. (2d) 330, 343(18). It is to be regretted that in criminal cases of great notoriety the prosecuting officers, goaded by the press and public indignation, will adopt a reckless course jeopardizing the result, when, from the standpoint of public interest, the most painstaking care is required, and, as such things go, a conviction on the evidence would probably be easiest. A defendant—any defendant—in a criminal case is entitled to the rights which the statute and Constitution give him. No court can refuse to enforce them where the record calls for it.

Finding no reversible error the judgment is affirmed. All concur, except *Tipton, J.,* not sitting.