STATE of Missouri, Respondent,

v.

James Marvin FIELDS, Appellant.

No. 53771.

Supreme Court of Missouri, Division No. 2.

Nov. 12, 1968.

Rehearing Denied Dec. 9, 1968.

Norman H. Anderson, Atty. Gen., Jefferson City, Anthony J. Sestric, Special Asst. Atty. Gen., St. Louis, for respondent.

Meredith B. Turner, Donald R. Duncan, Springfield, for appellant.

EAGER, Judge.

Defendant was charged by information and convicted by a jury of the armed robbery of a service station located on the north edge of Springfield. Since defendant was charged also with a conviction and sentence for a prior felony and imprisonment therefor and stipulated to the truth of that charge, the Court fixed the penalty and sentenced defendant to a term of ten years. This appeal followed in due course. Defendant was exceedingly well represented at the trial and here by appointed counsel, one at trial and two others here. The sufficiency of the evidence is not challenged, but the points made concerning the admission of evidence necessitate a detailed review of the evidence.

The following facts could reasonably have been found by the jury. Robert Utt and Clyde McBee were the attendants in charge of a Hudson Oil Company filling station on the evening of July 4, 1967; it was located on the east side of Highway 13, just inside the north city limits of Springfield. Utt looked out the rather large south window and saw a man, 5 or 6 feet away, holding a large caliber automatic pistol, pointed at him; the man's face was partly concealed by a black hat and a black veil; the man said "This is a hold-up," and told them to bring him the money and "come around" outside; the employees did go out, taking about $80 or $81 with them, and the man instructed them to lay it on the walk, which they did; the robber then said "that's far enough" and he picked up the money; he instructed them to travel in a certain direction across a fence and to keep going; after they crossed the fence McBee looked back, and they immediately heard what sounded like a shot; McBee dropped to the ground, but they then proceeded on, circled back and called "the law." When the officers arrived, they found a woman's black hat with a veil lying on the grass outside the station. At the trial Utt identified an exhibit as that hat; he described in part defendant's attire as a jacket which looked somewhat "pur-plish" uder the fluorescent lights, and dark "loafers" with a white substance on them. This witness also testified that when defendant was brought to the station a little later his height and build compared favorably with those of the robber, that he had on the same type of shoes with white paint on them, and that the coat which the officers brought in separately was similar to the one which the man wore. He testified that the station's money was short between $81 and $82 after the robbery. Utt did not positively identify defendant as the robber.

Sheriff's deputies and city policemen answered the call. The time was about 11:00 p. m. One deputy sheriff decided to travel north and another south from the station to investigate; while Officer Wester was stopped about 200 yards north of the station (to investigate a car parked in a driveway on the west) he saw a man coming up out of a rather deep ditch on the east side of the road; in answer to an inquiry as to where he had been (the officer knew him) the man said that he had been "watching the fireworks." This man was the defendant. He was taken back to the station, after the officer read to him the "Miranda" warnings. A man's blue coat was found by the officers along the shoulder of the road about a quarter of a mile north of the station; this coat had $81 in a pocket. Defendant's shoes were given to Deputy Hughes who came with the bloodhound "Sue." The shoes had white paint on them. The officers showed Hughes where the coat had been found.

Deputy Sheriff Hughes testified: that he was in charge of the "canine patrol" which consisted of four bloodhounds, six German Shepherds and one Doberman Pinscher; that he had been in that work for two and one-half years; that the bloodhounds are worked "on trail" about once a week, and that he generally worked with "Sue," a female "registered" bloodhound; that she had been used "for tracking purposes" previously, probably 30 or 35 times, and that he, personally, had worked with

her for two years and a half on approximately eight or ten actual trackings or "regular catches," and on perhaps five where Sue was used alone. He related specifically two trackings where Sue had located the "subjects" after tracking for two and one-half and eighteen miles, respectively. He further testified: that on many (30–35) other occasions Sue had been rotated in a team of two dogs; that their total successes had been 41 out of 44 trackings, in that the person or persons whose scent was being followed had been found. Many of these were escapees, where clothing of the "subject" was presented to the dog. When the dog finds the person sought, it walks "right directly up to him" and then quits tracking.

On this occasion Hughes took Sue out of his car 300 or 400 yards north of the station; he gave her the scent from defendant's shoes, perhaps a little nearer the station; she proceeded along the east shoulder of the highway, but did not "take track" until she reached a point perhaps 150 feet north of the station; thence she trailed up the ditch to the station, "messed around" there for a while, came back along the ditch a little farther east, went over in the brush and came back out to the highway at a point where there were three mailboxes, then back up the ditch and across the highway to where a wrecker and a car were standing. Hughes could not get her to trail farther. The jury could well have found that this was the point where defendant had been put in the police car. The dog did not confront the defendant, for he had already been taken away. The other officers had advised Hughes that the spot where the mailboxes were was the place where the coat was found; the dog trailed to that point.

Defendant was given a nitrate test, often described as a paraffin test, by Detective Dan McGuire of the Springfield police. When McGuire suggested this to defendant, the latter said that his lawyer had advised him not to "make any tests," but said almost immediately in answer to a question: "I don't care if you do six." The tests and the results were described in detail. Melted wax, when sufficiently cooled, was applied to both hands, like casts, and this was then removed; a "nitrate reagent," dipenylbencidine and sulphuric acid, was then applied to the wax; there was no reaction from the left hand, but from the right "a moderately heavy concentration of nitrate" was disclosed, "mostly on the back of the index finger and thumb and the web back to about the wrist here." The presence of nitrate causes a blue color when the reagent is applied. McGuire then washed the cast where the reaction had been shown and examined it under a microscope; he observed unburned particles of smokeless powder such as is now universally used in ammunition for firearms. In describing the test the witness further testified: that the test was made about 2:45 a. m. on July 5, 1967; that the presence of nitrate may usually be noted for about three days; that when a gun is fired unburned powder and air rush back to fill a vacuum, and the powder becomes embedded in the pores of the skin; the warm wax opens the pores and releases the powder. This witness had made the test at least 200 times; he testified that while the presence of two or three other nitrates (specifically, fertilizer and old-style kitchen matches) might show a nitrate reaction from the reagent, nothing else would have the appearance of smokeless powder under the miscroscope; that black powder is used in fireworks but not in modern firearms; he stated that there was "quite a bit" of nitrate concentration in this case; he had preserved the casts and the powder residue.

Upon arraignment, with counsel, defendant plead not guilty and his constitutional rights were explained; he had previously requested in writing of the prosecutor that he be given a "lie detector" test, and conferences had been held on that subject. On the day of the arraignment, in open court, defendant, his counsel, and the Assistant Prosecutor executed a stipulation which was filed and approved by the Court.

After reciting defendant's request (which asked also that he be released if thus found "not guilty") and the discussions between counsel, the stipulation provided in substance: that a polygraph should be given to defendant by Sgt. Joe Duncan of the Missouri Highway Patrol; that defendant waived "absolutely and irrevocably each and every objection to the use in evidence by the prosecution of the results of said test," and he specifically agreed that Sgt. Duncan should be permitted to testify *without objection* "about the test and its results," including a description of the test, the questions and answers asked and given, defendant's responses as recorded, and Sgt. Duncan's conclusions drawn from the test," including the issue of "whether defendant's answers were truthful or not"; in the stipulation defendant expressly waived all objections to the "relevancy, materiality, competency, *accuracy, constitutionality, reliability*" and all other objections that could be made to such evidence. (Italics ours.) The stipulation then contained another and specific waiver of sundry listed constitutional rights and protections for the purposes set out in the stipulation. The stipulation also listed certain questions which defendant agreed to answer, among others; the listed questions specifically concerned the robbery of the service station; it was finally stipulated that if Sgt. Duncan concluded that defendant's answers were truthful and that he was not guilty, the Assistant Prosecutor would ask leave to *nolle prosequi* the robbery charge.

At the trial Sgt. Duncan testified in much detail about the tests thus given to defendant, with full descriptions of the apparatus, the questions, the answers, defendant's reactions, and Duncan's conclusions. Briefly, the machine (by different attachments to the body) records reactions in blood pressure, the pulse, by rate and amplitude, respiration rate and amplitude, and the "galvanic" skin reaction (apparently the skin resistance to electric current); these are physiological changes, and each is recorded on a separate moving graph, timed to fit the respective questions and answers. Sgt. Duncan had been doing this work for more than six years and had attended schools of instruction at the Highway Patrol laboratory and in New York at a school affiliated with New York University; he estimated that he had given approximately one thousand of such tests. The tests are usually (and were here) given in two or three instalments, with periods for relaxation; nothing is done to cause pain. As a part of the test the witness asked defendant certain irrelevant questions, such as his name, age and place of residence; there was no unusual reaction to these. He also recorded defendant's responses when *told* to give false answers about the description of playing cards picked from a pack; to these, there were moderate reactions when so answering. These *preliminary tests* fixed a so-called "norm" for the later reactions. Defendant was then asked the stipulated and material questions about the robbery, i. e.,—did he participate, did he point a gun at the men, did you take money from the men, was he guilty of the robbery, did he receive any of the money, and was he an accessory to the robbery. To all of these the graphs showed marked changes in blood pressure, pulse, respiration and skin resistance (some or all); some of these were described as "dramatic" and one group was described as a "picture book response." The witness stated, without objection, that in his opinion the negative answer to each of these material questions was deceptive. To several wholly irrelevant questions interspersed between the vital ones the responses were normal and wholly different. The test was repeated twice with the same results. Some of the reactions in blood pressure and skin resistance were the maximum which the machine would show. The witness produced, explained fully, and showed to the jury the charts made upon this examination, including the various graphs and the relationship of each to the question or questions asked. In conclusion, he testified that from the results of the test he "concluded that Mr. Fields was

attempting deception on the questions that pertained to this offense," and that his answers denying implication were deceptive answers. An objection made to the question was withdrawn. On cross-examination the witness testified: that being charged with a crime might make one apprehensive, that there are persons who are "non-reactors," that some tests are inconclusive, but that if a person is normal, mentally and physically, the "margin of error is very slight"; that certain conditions might affect the results, such as fatigue, alcohol, drugs, etc., and that the tests reveal physical reactions. He further testified, however, that none of the outside influences mentioned were present here as indicated in his preliminary tests; also, that this test was "very conclusive," so far as he was concerned.

Prior to the testimony of Sgt. Duncan, counsel for defendant stated to the Court, by way of objection: "If it's permissible for the defendant to waive his right to any objection in connection with the polygraph test, then this witness has done so, but on the other hand I wish to save any objection that this defendant might have to the ability any defendant in the State of Missouri to waive any qualifications concerning the taking of a polygraph and the admitting of the results thereof into evidence. * * * I want the record to show that as far as the defendant is concerned and his counsel, myself, the stipulation was voluntarily entered into and the record made was voluntarily made. My only objective is to preserve for review of the Supreme Court of Missouri the question of whether or not this defendant, as well as others, can waive in its entirety their constitutional rights with regard to the polygraph test."

At the conclusion of all the evidence defendant, out of the presence of the jury, testified in support of his oral motion to suppress the testimony concerning the paraffin tests, as follows: that he told the officer that he would not consent to the test; that no force was used and that he

was not coerced physically, threatened, or abused verbally; that he did reply "more or less sarcastically" to a question about submitting to the test, that "I don't care if you take six"; that he did not resist physically. The trial court then found that defendant had submitted to the test "voluntarily" in the usual sense of the word, and ruled that it would adhere to its prior action in overruling the motion to suppress. The original motion had been made at the beginning of the trial.

Three points are raised in defendant's brief: (1) that the testimony and exhibits concerning the polygraph test and its results were inadmissible because, (a) such a test is not sufficiently accurate or certain to justify its use in a criminal trial and the stipulation did not make it so; (b) the stipulation was an agreement to rely upon "chance"; (c) that this evidence violated defendant's rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution, and Art. I, Sections 10 and 19 of the Missouri Constitution, V.A.M.S.; (2) that the Court erred in admitting evidence of the nitrate or paraffin test, because such test is unreliable and inconclusive; and (3) that it was error to permit evidence concerning the bloodhound because no proper foundation had been laid therefor.

■ The Lie Detector Tests. We begin with the assertion that if the results of such a test or tests and the opinion of the operator may ever be made admissible in evidence by stipulation, such has been done here. Counsel so stated in open court, when he made his constitutional objection. And we note here that no objection was made then or otherwise during the trial to the supposed inaccuracies of such tests. That objection appears for the first time in the motion for new trial, and it comes too late. The rule is that objections to testimony must be specific and give a valid reason so that the trial court is afforded an opportunity to rule on the point. State v. Merchant, Mo., 119 S.W.2d 303; State v. Davit,

343 Mo. 1151, 125 S.W.2d 47; State v. Daugherty, Mo., 126 S.W.2d 237; State v. Hobson, Mo., 177 S.W. 374; State v. Todd, Mo., 225 S.W. 909; State v. Johnson, Mo., 192 S.W. 441; State v. Horton, Mo., 153 S.W. 1051. The only objection made to the evidence of the lie detector tests (including the facts and opinions), was that the admission of this evidence, even on the basis of the stipulation, would be a violation of defendant's constitutional rights, as specified. There was no objection at any time founded upon the supposed scientific inaccuracy of the tests. That objection cannot now be considered, even though raised in the motion for new trial. In fact, the objection as made clearly led the trial court to believe that the only question raised was founded on constitutional grounds, and the Court was naturally not concerned with any possible controversy over the scientific accuracy of such tests. But there is another reason, stronger and wholly independent of the first, why such an objection may not now be maintained. In the stipulation, solemnly agreed to in writing in open court and specifically stated by counsel to have been voluntarily entered into by defendant and his counsel, the defendant not only waived generally *all* objections to evidence of the tests and the results thereof, including Sgt. Duncan's conclusions, but he specifically waived all objections that "could possibly be made by the defendant to * * * relevancy, materiality, competency, *accuracy,* constitutionality, reliability, and any and all other objections of any nature whatsoever * * *," the intent being that such evidence shall be admitted *"without objection."* It would be almost unthinkable to permit defendant now to reverse his position and oppose the reception of this evidence for the sole reason that the results were not favorable to him. We decline now to rule upon the admissibility of this evidence from the standpoint of the scientific acceptance or nonacceptance of such tests or of their accuracy. Nor shall we discuss the cited cases so doing.

We consider defendant's contention that the stipulation was invalid because it violated defendant's constitutional rights. Counsel cite the Fourth, Fifth and Fourteenth Amendments of the United States Constitution, but seem to concentrate on the self-incrimination provisions of the Fifth. They point out the *dissent* in People v. Schiers, Cal., 329 P.2d 1, and the opinions in Schmerber v. State of Cal., 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, and Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, 23 A.L.R.2d 1292. In Schiers, the defendant had been given a lie detector test, supposedly with his consent but without representation by counsel, and with no pretense of any stipulation. Apparently there was no evidence concerning the methods used, the questions asked, the reactions of the defendant, the identity or qualifications of the operator, or the general theory, meaning and accuracy of such tests. A policeman testified that after the test was made he had told defendant that the test indicated that he was lying. The trial court later struck that evidence and instructed the jury to disregard it. The Court of Appeals affirmed. The Supreme Court of California denied a petition for a hearing. The dissent, in substance, held that the occurrence was such as to constitute a denial of due process and an infringement of the privilege against self-incrimination. We need not pursue the reasoning or content of the opinion, for the facts there were so different from ours as to make it wholly inapplicable.

Schmerber, supra, involved the taking of blood for a test to determine intoxication; the blood was taken in a hospital from an accident victim (suspected reasonably of being drunk), despite his refusal on advice of counsel to permit it. The Court held that this action infringed no constitutional rights, including those of due process, against self-incrimination, and against unreasonable searches and seizures. The evidence showing that the test indicated intoxication was held to have been properly admitted. The case seems to have been cited here only for the passing reference made by the Court to the effect that "Some tests seemingly directed to obtain 'physical evidence,' for example, lie detector tests meas-

uring changes in body function during interrogation, may actually be directed to eliciting responses which are essentially testimonial. To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment." At best, the statement would seem to have been dicta there, and it is wholly inapplicable here because this defendant was not compelled to do anything. The case of Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, 23 A.L.R.2d 1292, has nothing to do with the constitutional questions. We shall not consider an authority cited from a German Appellate Court.

Counsel argue that defendant's agreement to take the test became a sort of confession, induced by the hope of release. It is conceded that the agreement was in *nowise induced* by the State; the idea was initiated by the defendant himself, and the stipulation was made by him after full consultation with his own counsel. If it was a "gamble," as counsel now say, it was no more such than various things a defendant may elect to do in a criminal proceeding, such as taking his chances on a plea of guilty rather than the verdict of a jury. There was no failure here on the part of the State to fulfill any promise; defendant's hoped-for result was simply destroyed by the test.

The cases cited by defendant on the inadmissibility of evidence of such tests, even though taken by agreement, do not deal with the constitutional question. We are therefore not considering them. They are, principally: LeFevre v. State, 242 Wis. 416, 8 N.W.2d 288; Conley v. Commonwealth, Ky., 382 S.W.2d 865; State v. Trimble, 68 N.Mex. 406, 362 P.2d 788; People v. Zazzetta, 27 Ill.2d 302, 189 N.E.2d 260. And we may say, parenthetically, that in all those cases the facts, the nature of the testimony given or omitted, and the character of the supposed agreement varied so widely from those in the present case as to make their

applicability extremely doubtful, even if considered on the merits. And contra, see: State v. Valdez, 91 Ariz. 274, 371 P.2d 894; State v. McNamara, 252 Iowa 19, 104 N.W. 2d 568; People v. Houser, 85 Cal.App.2d 686, 193 P.2d 937; and queries raised in People v. Potts, 74 Ill.App.2d 301, 220 N.E. 2d 251; State v. Arnwine, 67 N.J.Super. 483, 171 A.2d 124. It is clear that the great majority of our courts hold that evidence of the results of lie detector tests are not admissible in the absence of an agreement, whether offered by the State or the defendant. We do not pause to cite those cases here, for they decide nothing which is now material. We do note that the agreement here was *not* merely one to take the test, but also a firm agreement that evidence of all the results thereof and the opinions of the specified operator should be *admitted in evidence* without objection.

▇ A defendant may waive sundry constitutional rights and privileges, if this is done by him intelligently and voluntarily. Among these are: the right to counsel, State v. Moreland, Mo., 396 S.W.2d 589, and cases there cited; Westbrook v. Arizona, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429; the right to object to the composition of a grand jury, Michel v. State of Louisiana, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83; the right to remain silent upon interrogation, State v. Beasley, Mo., 404 S.W.2d 689; Miranda v. State of Arizona, 384 U.S. 436, loc. cit. 475, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694; the right to trial by jury, by entry of a plea of guilty or otherwise, State v. Harris, Mo., 420 S.W.2d 325; Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314; Mo.Cr.Rule 25.04, V.A.M.R.; the privilege against a search or seizure, State v. Holbert, Mo., 416 S.W.2d 129; State v. Holt, Mo., 415 S.W.2d 761; State v. Hill, Mo., 419 S.W.2d 46. Assuming, for the sake of argument, that defendant had a constitutional right to refuse to take such a test, and to exclude the admission in evidence of its results if taken, he most assuredly waived all such rights here by his solemn agreement. No one denies even now, that

the agreement was fully and completely voluntary on his part, or that it was made and entered into with the full advice of his counsel. The stipulation itself contained an express waiver of constitutional objections. In so far as counsel now say that some of the questions asked in the test were inconsistent, we merely answer that each and all of them were agreed to and set out in the stipulation. We hold that none of defendant's constitutional rights or privileges were infringed, under these circumstances, by the admission of this evidence. The weight of the evidence was solely for the jury, in the light of a most extensive cross-examination.

The next point is that the State's evidence concerning the nitrate or paraffin test and its results was inadmissible because the test is unreliable and inconclusive. Such a test is made, of course, to aid in determining whether a suspected person has recently fired a gun, particularly a pistol. As indicated in our review of the evidence, it consists of a test for nitrate reaction on the person's hands, that being the principal ingredient of gunpowder. The evidence, if obtained, is admittedly circumstantial. There are apparently no cases in Missouri ruling the admissibility of such evidence. Defendant cites: Brooke v. People, 139 Colo. 388, 339 P.2d 993 (1959); Born v. State, Okl.Cr., 397 P.2d 924; Clarke v. State, Tenn., 402 S.W.2d 863. We review these cases very briefly. In Brooke, the result of such a test upon a corpse (to refute suicide) was held inadmissible; defendant had refused to take the test upon advice of his attorneys. The latter evidence was also held inadmissible. In our case the trial court has specifically found that the test was taken voluntarily and we agree with that finding. There is now no contention to the contrary. The opinion in Brooke, in so far as it concerned the general admissibility of such evidence, was based upon the view that the test was not shown to be sufficiently reliable for use as evidence in a criminal trial. In so holding the Court relied principally upon quoted material from

the "Journal of Criminal Law and Criminology," Vol. 46, 1955–1956, indicating a percentage of "gross error," and also stating that the only result from the test is to ascertain whether "nitrates were present," and not (specifically) whether a gun was fired. There was little or no effort in that case to describe the efficacy of the test by expert testimony. In Born, such a test was also made of a decedent's hands (to refute a theory of the defendant) and the State's evidence was that the results were negative. Essentially, the Court merely followed the reasoning of Brooke, supra, quoting extensively from the text used there, but it concluded by holding that no proper objection had been made. In Clarke, supra, it was held that testimony that defendant had refused to take the paraffin test was improperly admitted but that in view of other evidence, the error was not reversible. The opinion may be considered, by dicta or otherwise, as following Brooke. There was no direct issue on the admissibility of the results of such a test, properly conducted and described in evidence.

The contrary view was taken in Henson v. State, 159 Tex.Cr.R. 647, 266 S.W.2d 864. Much of the discussion there was of a supposed infringement of the constitutional right against self-incrimination; the Court ruled, in essence, that the making of this test did not constitute testimonial evidence, and that there was no infringement of defendant's privilege against self-incrimination. The admissibility of the evidence of the nitrate test was upheld against the further contention that the test was unreliable. See, also Wharton's Criminal Evidence, 12th Ed., Vol. 2, § 644. In Commonwealth v. Westwood, 324 Pa. 289, 188 A. 304, evidence of such a test was held to be admissible, as was the testimony of one or more experts on each side concerning it. There was also a microscopic examination of the powder in that case. We note that defendant does not raise in this Court any question of constitutional infringement as to the nitrate test.

Concededly, all such evidence is circumstantial, but it is not inadmissible for that reason. In the present case the record shows: that the details of the test and the methods used were fully explained; that it was performed by an experienced police technician who had performed similar tests about 200 times; that this operator was fully cross-examined. The main objection made to such tests seems to be that some other form of nitrate may be discovered such as is contained in fertilizer or old-style kitchen matches (these being the only two mentioned by the witness here). Circumstantial evidence may have a material relevance even though it does not exclude every adverse possibility. We hold that such evidence is admissible in the discretion of the trial court where, in his opinion, the operator is shown to be sufficiently qualified, the test has been conducted according to the usual standards, and the procedure and results are adequately described; and also, if the operator is present and subject to cross-examination. We do not imply that a mere report shall be admissible, except by agreement.

If we had any doubt here, however, it would be entirely dispelled by the testimony concerning the examination of these particular nitrate particles under the microscope by the technician. He positively identified them as smokeless powder, thus distinguishing them completely from any and all other forms of nitrate. The result of that examination constituted very strong evidence that the defendant had recently fired a gun, and if the nitrate test, in and of itself, needed any corroboration, it was amply supplied. In none of the cases where the evidence was excluded was such corroboration shown.

Finally, we reach the bloodhound, Sue. We fear that we have spent so much time, space and energy on the other points that we shall not do her full justice. The principal objection seems to be that Sue was not sufficiently qualified as an expert, and that her pedigree was not established. Probably neither the trial court nor the writer is an expert on bloodhounds and we doubt that the Missouri Judges who have written the few existing opinions were such, either. Three cases are cited as supposedly indicating that the evidence of Sue's activities should have been excluded. They are: State v. Rasco, 239 Mo. 535, 144 S.W. 449; State v. Steely, 327 Mo. 16, 33 S.W.2d 938; State v. Freyer, 330 Mo. 62, 48 S.W.2d 894. To these we add State v. Long, 336 Mo. 630, 80 S.W.2d 154. These cases do not rule out the evidence which was received here. Generally speaking, they merely lay down a set (or sets) of qualifications which should be shown before the evidence of the actual trailing by the dog is admitted. These are, in substance: that the dog is of pure breed; that it has been trained to trail humans, and has the capacity to do so; and that it is qualified by experience to follow a human trail. As indicated in the cited cases and in an extensive note in 94 A.L.R. at page 413, et seq., the majority of the courts which have passed on the question hold such evidence to be admissible when such a foundation has been laid. Such evidence is not alone sufficient to support a conviction; it is circumstantial and merely corroboratory.

The objection here is that a foundation was not sufficiently laid. We hold that it was, although perhaps more detail could have been shown. The dog was shown without objection to be "a registered bloodhound"; one definition of this term, as listed in Webster's Third International Dictionary, is "recorded on the basis of pedigree * * *." It is a matter of common knowledge that a registered animal is one listed on the records of some purebred association or organization created and maintained for animals of that class or breed. We need not run Sue's "pedigree" back for six generations as defendant, at one point, seems to suggest. We further consider that the evidence of her training, capacity and past performance was sufficient to make the evidence of her work admissible. As said in Rasco, supra, at 144 S.W. 449, loc. cit. 461: "It is urged that the

testimony did not sufficiently qualify the bloodhounds. We think it did. The evidence tended to show that they were of pure breed, that they had been successfully trained to track human beings, and that they had in numerous instances, during two years' experience, demonstrated their ability and fidelity in following a human trail."

 The weight of this evidence was, of course, for the jury, and it may not have been considered as great. The dog was given the scent in this case from a shoe taken from the defendant almost immediately before; the procedure used did not, perhaps, follow the common course, in that the dog was not started at the service station. But the testimony was that she picked up the trail along the ditch at approximately the point where defendant had been arrested, followed it to the service station, remained there for a time, went back along and east of the ditch, to a point where a coat (similar to defendant's and with $81 in it) had been found, and thence on to the place where defendant had been put in the police car. The value of such tests rests in the law of probabilities, Rasco, supra, and the results are not claimed to be infallible. The evidence constitutes merely one part of the totality of the circumstantial evidence. It is a matter of judicial notice that bloodhounds are still frequently used, principally in apprehending escapees from jails or penal institutions. We hold that the evidence was admissible and that there was no error; in addition, we doubt seriously that its admission would have been prejudicial, even had there been error. There was much other circumstantial evidence to connect defendant with the offense.

We find no error in those matters of record which we are required to examine under Rule 28.02. In conclusion, we may state that this defendant could not have been more competently and zealously represented at the trial and on appeal if he had been possessed of unlimited funds to employ counsel. We express here our appreciation to those members of our Bar who performed these services.

The judgment is affirmed.

All of the Judges concur.