**STATE of Missouri, Respondent,**

v.

**Thomas Woodrow BIDDLE, Appellant.**

**No. 61784.**

Supreme Court of Missouri,
En Banc.

May 13, 1980.
Rehearing Denied June 10, 1980.

Dale Reesman, Boonville, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, III, Asst. Atty. Gen., Jefferson City, for respondent.

SEILER, Judge.

Thomas Woodrow Biddle, charged as a second offender, was convicted by a jury of robbery, first degree, § 560.120, RSMo 1969, and the court fixed his punishment at imprisonment for twenty-five years. The court of appeals reversed on a determination that the evidence was insufficient to sustain conviction. One member of the court, in dissent, certified for the purposes of transfer to this court that he deemed the majority opinion in conflict with prior Missouri case law regarding the admissibility of polygraph examination results and the sufficiency of the evidence to sustain a conviction, Mo.Const. art. V, § 10; Rule 83.01, matters which we address in our opinion.[1]

At approximately 8:30 p. m. on September 9, 1975, two men wearing nylon stocking masks entered the Wagon Wheel Liquor Store located about one half mile east of Otterville, Missouri, on U.S. Route 50 in Cooper County. The taller of the two, armed with a sawed-off shotgun, demanded that Betty Starke, owner of the store, hand over all her money. Money taken by the robbers from the cash register, a closet in back of the store and the victim's purse totalled $629.00, including sixty to seventy dollars in coins. Among the coins taken were two half-dollars bearing a bicentennial year commemoration which Mrs. Starke had saved for her daughter. Just as the robbers were leaving, Mrs. Starke heard her husband entering through the back door. She ran to the back door to warn her husband. Consequently, she did not see how or in what direction the two men fled.

Mrs. Starke called Deputy Sheriff McIntyre in Otterville at about 9:00 p. m. When he arrived a few minutes later, the victim could give no description of the two men except that one was over six feet tall. She later identified the tall man; she never was able to identify the shorter of the two men, was unable to identify the type of clothing he was wearing, and did not know whether he was white or black.

The Missouri State Highway Patrol was alerted by radio. Trooper Carlyle arrived at the Wagon Wheel at about 9:08 p. m. He talked with Mrs. Starke and Deputy McIntyre and proceeded to patrol the roads in search of the two robbers. Trooper Hurt arrived in the area between 9:30 and 10:00 p. m., and proceeded to search the highways and back roads. Trooper Hurt received a report over C.B. radio at 2:30 a. m. that a man was seen entering a ditch next to U.S. 50 four to five miles east of the liquor store. The ditch was some eight or ten feet from the highway and defendant was visible to the trooper. The trooper ordered defendant from the ditch, then arrested, handcuffed, and frisked him, and thereby discovered that defendant had a pocket full of change. The area was described by the trooper as fairly open with better hiding places nearby. Defendant was wearing a short sleeve T-shirt and blue jeans. Defendant appeared to have been drinking, although the troopers did not believe that he was intoxicated. They thought that he was feigning drunkenness.

Defendant was taken to the Cooper County jail and although later rearrested, was released on the evening of September 10 for want of identification as one of the robbers. Upon his release, the $22.50 in coins seized from him was returned, at which time the sheriff observed among the coins two half-dollars bearing the bicentennial year commemoration.

At the trial, defendant's father testified that defendant had stopped by his father's home in Columbia, Missouri, early on the evening of September 9th; that defendant

---

1. While the dissenting opinion asserts that this court has raised sua sponte the issue about the admissibility of polygraph evidence even where the parties have entered into a stipulation and also the issue of the reliability of polygraph evidence for any purpose, the case comes to us in this posture from the court of appeals, these being the issues which divided that court and provoked the transfer. These issues were addressed by the state in its supplemental brief in this court and were argued pro and con by counsel before us.

counted out and borrowed approximately $15.00 in change from a can full of coins. Two witnesses testified that defendant was at the Hitching Post Tavern in nearby Rocheport, some fifty miles from Otterville, on the evening of September 9 and left the tavern alone at approximately 8:45 or 9:00 p. m. Defendant did not testify.

According to Sheriff Morris, defendant, while in custody, related that on the night of September 9th, he had been in a poker game in the Otterville area and became intoxicated. He did not know who drove him to the game or the names of any persons in the game. The unknown person who drove him to the poker game had left the game without him and defendant had started walking towards Rocheport or Columbia when he was arrested.

While awaiting trial, defendant submitted to a polygraph (also known as a "lie detector") examination per a written stipulation entered into with the state. Pursuant to a clause contained in the written stipulation which permitted either party to offer the results of the polygraph examination in evidence, the state called the polygraph examiner whose testimony, in substance, was that in his opinion defendant's response to questions relating to participation in, knowledge of, and receipt of any proceeds of the robbery in question "indicated deception". The defendant had filed a motion to suppress the results of the polygraph examination and renewed his objection thereto during the trial on the ground that the state breached the terms of the stipulation. A further stipulation entered into between the state and the defendant provided evidence that defendant escaped from the Moniteau County jail while awaiting trial and was later apprehended in the state of California.

On appeal, the court of appeals en banc held that "testimony as to the results of polygraph examinations does not constitute substantive evidence of an accused's guilt . . . ." As briefly noted above, one of the judges dissented and certified for the purposes of transfer to this court that the court of appeals opinion was in conflict with *State v. Fields*, 434 S.W.2d 507 (Mo.1968), and that the limitation on the use of polygraph results impinged upon the rule "that the weight of the evidence is the sole prerogative of the jury." The dissent also asserted that the court's decision was in error "in its holding that the circumstantial evidence presented by the state fails to make a submissible case of appellant's guilt."

I

The results of polygraph examinations are inadmissible as evidence in a criminal trial because they lack scientific support for their reliability. *State v. Weindorf*, 361 S.W.2d 806, 811 (Mo.1962); *State v. Cole*, 354 Mo. 181, 188 S.W.2d 43, 51 (1945).[2] At least 40 other jurisdictions follow the general rule that the results of a polygraph examination are inadmissible in evidence to show the guilt or innocence of the accused. *People v. Monigan*, 72 Ill. App.3d 87, 28 Ill.Dec. 395, 390 N.E.2d 562, 565 (1979). Likewise inadmissible in evidence are an accused's offer or professed willingness to submit to a polygraph examination, *State v. Bibee*, 496 S.W.2d 305, 316 (Mo.App.1973), and testimony or prosecutorial comment to the effect that the accused was unwilling to undergo a polygraph examination. *State v. Faught*, 546 S.W.2d 515, 519 (Mo.App.1977).

A

In *State v. Fields, supra*, a division of this court considered the question of the admissibility of polygraph examination results in terms of the constitutional issue regarding self-incrimination, when prior to trial both parties have waived objections to their admissibility. The court explicitly refused to decide the issue of the examination results admissibility as it relates to the lack of scientific acceptance of their accuracy: "We decline now to rule upon the admissibility of this evidence from the standpoint

2. For a similar ruling on the lack of scientific reliability of neutron activation analysis of blood samples, see *State v. Stout*, 478 S.W.2d 368 (Mo.1972).

of the scientific acceptance or nonacceptance of such tests or of their accuracy." 434 S.W.2d at 513. The opinion then noted that constitutional rights may be intelligently and voluntarily waived by a defendant and concluded that the defendant in that case had expressly waived through his stipulation any constitutional objection to the admissibility of the evidence. In the conclusion of its discussion of this point, the court in *Fields* noted:

> "We hold that none of defendant's constitutional rights or privileges were infringed, under these circumstances, by the admission of this evidence. The weight of the evidence was solely for the jury . . ."

434 S.W.2d at 515. The court did not elaborate on what it meant by "weight of the evidence," nor was such an elaboration necessary in a decision expressly limited to consideration of the narrow constitutional issue presented and where the use of the polygraph evidence was not essential to the making of a submissible case against the defendant.[3] *Fields* did not hold that parties may by stipulation make inadmissible evidence somehow admissible or that parties may by stipulation bind or circumscribe a court in its determination of questions of law.[4]

Despite the narrow issue decided in *Fields*, the opinion has been read by the appellate courts of this state to permit the admission in evidence of polygraph examination results, otherwise inadmissible for lack of scientific support for their reliability, where the defendant has waived objections to admissibility by stipulation. In *State v. Mick*, 546 S.W.2d 508 (Mo.App. 1976), the court of appeals stated, citing *Fields*, "However anomalous it may be, the parties by stipulation, may waive objections to the admission of polygraph examinations and their results, and in that sense imbue them with reliability and probative value." 546 S.W.2d at 509. In *State v. Scott*, 570 S.W.2d 813 (Mo.App.1978), the court of appeals stated, also citing *Fields*, that "the results of the polygraph examination administered to the defendant would have been inadmissible as evidence because they lacked scientific support for their reliability . . . . [citations omitted.] However, the written stipulation entered into between the parties gave the polygraph examination administered to defendant a legal aura of reliability, thereby infusing the conclusive results obtained with probative value." 570 S.W.2d at 814–15.

In deciding the case at bar, we have reexamined *Fields* and its successors, and we have studied the decisions of appellate courts of sister states in regard to the admissibility of polygraph examination results upon a prior stipulation of the parties. Today, of necessity, we address the issues left undecided in *Fields* and subsequently misread in *State v. Mick, supra*, and *State v. Scott, supra*.[5]

3. The state clearly had made a submissible case without the polygraph examination results in evidence in *Fields*. The other evidence which supported the conviction in *Fields*, included the following: results of a nitrate test; trained bloodhounds tracked the defendant; victim identified hat and veil worn by the robber; shoes and jacket worn by defendant were similar to those worn by robber and described by victim; the amount of money taken in the robbery was the same amount of money found in the pocket of the defendant's coat; and defendant was promptly apprehended in the immediate vicinity of the robbery.

4. The general rule is that stipulations of litigants cannot be invoked to bind or circumscribe a court in its determination of questions of law. *Stine v. Kansas City*, 458 S.W.2d 601, 606 (Mo.App.1970); "[V]irtually all jurisdictions recognize that stipulations as to the law are invalid and ineffective." 73 Am.Jur.2d *Stipulations* § 5 (1974).

5. Our examination of the admissibility in evidence of polygraph examination results where the parties by prior stipulation have waived objections to their admissibility is consistent with the general rule that "an agreement of the parties or a stipulation of their counsel on a matter of law is not binding on an appellate court so as to exclude that legal point from its scope of review of the case." 5 Am.Jur.2d *Appeal and Error* § 712 (1962). *See also Midella Enterprises, Inc. v. Missouri State Highway Commission*, 570 S.W.2d 298, 301 (Mo.App. 1978); *Stine v. Kansas City*, 458 S.W.2d 601, 606 (Mo.App.1974); 73 Am.Jur.2d *Stipulations* § 5 (1974).

## B

Courts in other jurisdictions have taken three general approaches with respect to the admissibility of results of polygraph examinations upon a prior stipulation of the defendant and the state. Several jurisdictions place virtually no limitation on the admissibility and use of testimony regarding polygraph examinations agreed to per stipulation.[6] Other jurisdictions have followed the opinion of the Arizona Supreme Court in *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962), which permitted the admission of polygraph examination results on the written stipulation of the parties subject to the trial judge's discretion, cross-examination rights and required jury instructions.[7] And other jurisdictions refuse to admit testimony regarding polygraph results notwithstanding stipulations, primarily on the basis that the polygraph's lack of scientific reliability which keeps it from admission in evidence cannot be altered by a stipulation of the parties.[8] We are convinced that this third approach is the correct one for the reasons stated in *People v. Monigan*, 72 Ill.App.3d 87, 28 Ill.Dec. 395, 390 N.E.2d 562 (1979), and *State v. Frazier*, 252 S.E.2d 39 (W.Va.1979) (quoted extensively in the *Monigan* opinion).

In *Monigan*, the court listed seven reasons for holding the results of polygraph examinations inadmissible in spite of a prior stipulation by the parties waiving objections to their admissibility:

"(1) A polygraph test is not independent proof of any fact, but merely bears on the credibility of the defendant.

"(2) The admission of the polygraph test has such an impact on the jury that the truth seeking function of the trial will be destroyed.

"(3) Unreliable evidence should not play a major part in the conviction or acquittal of a person charged with a crime.

"(4) A stipulation cannot make unreliable evidence reliable.

"(5) A stipulation that makes unreliable evidence admissible is contrary to public policy.

"(6) A stipulation that unreliable evidence is reliable is really a stipulation of law and therefore invalid.

"(7) It would be inconsistent for a court to refuse to admit polygraph tests into evidence because they are unreliable and then admit them into evidence by stipulation."

390 N.E.2d at 563.

Both *Monigan* and *State v. Frazier, supra*, reject the logic used in the cases following the approach in *State v. Valdez, supra*, which permits the admission of polygraph examination results upon stipulation at the trial judge's qualified discretion. In *Frazier*, the West Virginia Supreme Court reasoned:

"There are several problems arising from the *Valdez* concept. Its central thesis of admissibility is the written stipula-

---

**6.** *See People v. Trujillo*, 67 Cal.App.3d 547, 136 Cal.Rptr. 672 (1977); *State v. Chambers*, 240 Ga. 76, 239 S.E.2d 324 (1977); *State v. Galloway*, 167 N.W.2d 89 (Iowa 1969); *State v. Lassley*, 218 Kan. 758, 545 P.2d 383 (1976); *State v. Olmstead*, 261 N.W.2d 880 (N.D.1978), *cert. denied*, 436 U.S. 918, 98 S.Ct. 2264, 56 L.Ed.2d 759 (1978); and *State v. Bennett*, 17 Or.App. 197, 521 P.2d 31 (1974).

**7.** *See Williams v. State*, 378 A.2d 117 (Del. 1977); *Owens v. State*, 373 N.E.2d 913 (Ind. App.1978); *Commonwealth v. Allen*, —— Mass. ——, 387 N.E.2d 553 (1979); *Corbett v. State*, 584 P.2d 704 (Nev.1978); *State v. McDavitt*, 62 N.J. 36, 297 A.2d 849 (1972); *State v. Milano*, 297 N.C. 485, 256 S.E.2d 154 (1979); *State v. Souel*, 53 Ohio 2d 123, 372 N.E.2d 1318 (1978); *State v. Ross*, 7 Wash.App. 62, 497 P.2d 1343

(1972); and *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974); *Cullin v. State*, 565 P.2d 445 (Wyo.1977).

**8.** *See Pulakis v. State*, 476 P.2d 474 (Alaska 1970); *People v. Monigan*, 72 Ill.App.3d 87, 28 Ill.Dec. 395, 390 N.E.2d 562 (1979); *Conley v. Commonwealth*, 382 S.W.2d 865 (Ky.1964); *State v. Corbin*, 285 So.2d 234 (La.1973); *Akonom v. State*, 40 Md.App. 676, 394 A.2d 1213 (1978); *People v. Liddell*, 63 Mich.App. 491, 234 N.W.2d 669 (1975); *Jordan v. State*, 365 So.2d 1198 (Miss.1978); *State v. McClean*, 587 P.2d 20 (Mont.1978); *Fulton v. State*, 541 P.2d 871 (Okl.Cr.1975); *State v. LaForrest*, 106 N.H. 159, 207 A.2d 429 (1964); *Romero v. State*, 493 S.W.2d 206 (Tex.Cr.App.1973); and *State v. Frazier*, 252 S.E. 39 (W.Va.1979).

tion. Yet it is clear that by written stipulation parties cannot make evidence admissible that otherwise would be inadmissible. In other words, a written stipulation agreeing to the introduction of certain evidence is not the legal basis for its admissibility. *Pulakis v. State*, 476 P.2d 474, 479 (Alaska 1970) (polygraph test stipulation); 29 Am.Jur.2d Evidence § 13.

"It is true that *Valdez* and its progeny suggest that the examiner's testimony concerning the polygraph test bears upon the truthfulness of the subject's testimony, and therefore his credibility. Yet, if this were the real basis for its admissibility, there would be no need for the written stipulation, since it is generally held that any witness' credibility may be impeached. . . . [Citations omitted.]

"However, if the test bore merely on the issue of credibility, it would ordinarily not be admissible unless the defendant took the witness stand. Most cases that follow the *Valdez* stipulation, and *Valdez* itself, do not discuss, much less differentiate between, whether the test can be introduced in the state's case-in-chief or only for the impeachment of the defendant. . . .

"It is difficult to perceive how the written stipulation of the fact that the polygraph test can be admitted to impeach the credibility of the defendant can furnish any sound legal theory for the use of the polygraph in the state's case-in-chief. An even more difficult problem is encountered if we attempt to utilize these theories when the defendant seeks to admit a favorable polygraph test taken under a *Valdez* stipulation. If we follow the *Valdez* rationale that the polygraph test is not independent proof of any fact but merely bears on credibility, the defendant ordinarily cannot introduce his own extrajudicial exculpatory statements. They are generally thought to be too self-serving. [Citations.] We have not encountered a case which discusses this point. Obviously *the defendant gains little from a Valdez stipulation if he cannot introduce a favorable polygraph test.*"

252 S.E.2d at 45-46 (cited with approval in *Monigan* ).

In a similar vein, another court criticized the *Valdez* approach as missing the crucial issue of whether, as a matter of law the evidence is reliable:

"We find these cases unpersuasive and would venture to suggest that they are guilty of putting the cart before the well-known horse. As we see it, the crucial issue is whether, as a matter of law, this type of evidence is sufficiently reliable or trustworthy. It cannot logically be argued that a stipulation enhances in any significant way the inherent reliability of evidence produced by a so-called scientific process or art. See, e. g., *Pulakis v. State*, 476 P.2d 474, 479 (Alaska 1970). . . ."

*Akonom v. State*, 40 Md.App. 676, 394 A.2d 1213, 1216 (1978).

■ We agree with the logic that a stipulation cannot make admissible evidence which would otherwise be held inadmissible for lack of scientific reliability.

### C

In a 1945 decision, *State v. Cole, supra*, this court held that the polygraph did not have wide scientific approval and therefore the results of polygraph examinations are inadmissible. The Michigan Supreme Court recently reconsidered whether advances in polygraph technology have made polygraph examination results sufficiently reliable for admission into evidence. After an exhaustive and scholarly discussion of the question, the court concluded that "serious questions remain about the reliability of the technique and of its operators. We are also not convinced that the validity of the device has been satisfactorily established." *People v. Barbara*, 400 Mich. 352, 255 N.W.2d 171, 193 (1977). In *Akonom, supra*, the Maryland court observed that "If one thing is clear from the great mass of literature on polygraph testing, it is that the scientific community is still 'significantly divided,' [citations omitted] in its opinion concerning

the validity of the technique." 394 A.2d at 1219.

The West Virginia Supreme Court stated in *State v. Frazier, supra,* "We are persuaded that despite the assertions of the scientific nature of the test, much depends on the subjective analysis of test results by its operator. We know of no scientific test conventionally admitted by the courts which carries such a high degree of interpretative subjectivity." 252 S.E.2d at 48. On a related note, the *Monigan* decision expounded numerous other problems with polygraphic evidence:

"There are many problems connected with polygraph tests. In line with our concern about the examiner's role in testing, we note that Fred Inbau, a recognized expert in this field, states that 80% of all polygraph examiners are unqualified. ('The Case Against the Polygraph', 51 A.B.A.J. 857 (1965).) While the examiner may be subject to cross-examination, the polygraph itself is not susceptible to in-court examination and testing. (*State v. Lowry,* 163 Kan. 622, 185 P.2d 147 (1947).) We are also concerned that too many jurors may inordinately weigh polygraph results as conclusive (*State v. Cole,* 354 Mo. 181, 188 S.W.2d 43, 189 S.W.2d 541; *Romero v. State,* 493 S.W.2d 206, 213 (Tex.Cr.App.); Kaplan, 'Lie Detector: An Analysis of Its Place in the Law of Evidence,' 10 Wayne L.Rev. 381, 386 (1964)). And we also fear that in too many cases, a limiting instruction will not have the desired impact on the jury. (*Shepard v. U. S.,* 290 U.S. 96, 103, 54 S.Ct. 22, [25,] 78 L.Ed. 196; *People v. Deal,* 357 Ill. 634, 192 N.E. 649, 652; *National Cash Register Co. v. Kay,* 119 S.W.2d 437 (Mo.App.).) The use of such results also seem to displace the jury as finder of fact and adjudicator of guilt or innocence. (*U. S. v. Alexander,* 526 F.2d 161 (8th Cir. 1975).) In the recent case of *Akonom v. State,* [40 Md.App. 676] 394 A.2d 1213, the court said:

'We are also troubled by other likely effects of institutionalizing polygraph testing. Were private practices to spring up, some defendants might "shop around" until they passed an examination without divulging prior unsuccessful tests. On the other hand, the indigent defendant would be unable to "take an examination without the government's financing and knowledge." Wilson, supra.'

*State v. Bohner,* 210 Wis. 651, 246 N.W. 314, 86 A.L.R. 611 (1933); Note, Problems Remaining for the 'Generally Accepted' Polygraph, 53 B.U.L.Rev. 375, 377 (1973).) The Illinois Supreme Court has taken notice of most of these concerns already (*People v. Zazzetta* [, 27 Ill.2d 302, 189 N.E.2d 260]), as has the United States Justice Department in taking a strong stand against the use of polygraph results at trial. (See, Abbell, Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials, 15 Am.Crim.L. Rev. 29 (1977).) . . . We are also troubled by the almost total subjectiveness surrounding the use of the polygraph and the interpretation of the results: the results arise from psychological factors and their interpretation is totally dependent on the examiner's analysis. See generally, Inbau, Lie Detection and Criminal Investigation.

". . . This type of subjective factoring supports our belief that there are so many inequities inherent in the use of the polygraph as to make it, at this point in time, grossly unreliable, if not absent any probative value. . . ."

390 N.E.2d at 569. The court then noted that results of polygraph examinations, despite all of their inherent problems, are frequently interpreted by juries as independent proof of what are the most critical facts of the case. The court concluded that the admission of the results of the polygraph examination was reversible error. 390 N.E.2d at 571.

The estimated range of error for a given polygraph examination, assuming that the examiner is properly qualified,[9] has been

---

**9.** As noted above, one expert believes that 80% of all polygraph examiners are unqualified.

"The Case Against the Polygraph," 51 A.B.A.J. 857.

variously stated as 5%, 10%, 25%, and 30% by experts. L. Radek, *The Admissibility of Polygraph Results in Criminal Trials: A Case for the Status Quo*, 3 Loy.U.L.J. 289, 297 (1972).[10] A polygraph examination may be in error in its results, regardless of the examiner's qualifications, because of the emotional tension which may be experienced by one telling the truth, the subject's unique physiological or mental abnormalities, or by the subject's unobserved muscular movements which may provide misleading indications in the blood pressure tracings. J. Richardson, *Modern Scientific Evidence* § 10.2 (2d ed. 1974).

For example, in the case at bar, the first question asked defendant by the examiner was, "Do you live in the United States?", to which defendant answered, "Yes", an admittedly truthful answer. The machine, however, indicated the "Yes" answer was deceptive. The examiner explained this discrepancy between what the machine indicated and what the truth was as follows:

"Q. Are you saying, you're saying because they're nervous when they first one is disceptive? (sic).

"A. Invariably the first one will give me a response and sometimes it is tremendous."

The polygraph examinations were all made on April 1, 1976. After going through the series of questions once, the examiner repeated the process a second time and then a third. Each time the machine indicated the defendant was deceptive when he answered "Yes" to the question about living in the United States. While the examiner offered an explanation as to why this discrepancy could be expected with respect to the very first question asked an examinee, no explanation was offered and none occurs as to why the machine would continue indicating truthful answers to such an innocuous question as being deceptive. In the absence of our knowing beyond question what the truthful answer had to be (as in the question about living in the United States), we have no way of knowing how many erroneous indications were registered by the machine for other answers made by defendant where he may likewise have been telling the truth, but it is clear the machine is subject to grievous error.

Still another problem arises in that "the polygraph will not detect the witness who makes honest misstatements of fact, and it may not detect the hardened individual who recognizes no responsibility to conform to moral codes or standards of the community." *Modern Scientific Evidence*, at § 10.3. In view of the polygraph's margin of error and the myriad of factors which can lead to erroneous results,[11] there are two unacceptable possibilities which could occur were we to permit the admission of polygraph re-

10. Given the large margin of error stated by some experts and the disagreements among the experts as to the polygraph's reliability, a stipulation as to the admissibility of its results is, in effect, an agreement to rely upon chance rather than upon competent evidence, as well as an agreement regarding scientific opinion beyond the competence of either party to understand or evaluate.

11. Various commentaries have enunciated the multitude of problems that plague polygraphic evidence. The following authorities discuss in detail many of the persistent shortcomings of polygraphic evidence:

M. Abbell, Polygraph Evidence: The Case against Admissibility in Federal Criminal Trials, 15 Am.Crim.L.Rev. 29 (1977).

L. Burkey, The Case Against the Polygraph, 51 A.B.A.J. 855 (1965).

M. Forkosch, The Lie Detector and Mechanical Jurisprudence, 28 Okla.L.Rev. 288 (1975).

S. Highleyman, The deceptive certainty of the "Lie Detector," 10 Hastings L.J. 47 (1959).

E. Levitt, Scientific Evaluation of the "Lie Detector," 40 Iowa L.Rev. 440 (1955).

Note, Polygraphy: Short Circuit to Truth?, 29 U.Fla.L.Rev. 286 (1977).

Note, Problems Remaining for the "Generally Accepted" Polygraph, 53 B.U.L.Rev. 375 (1973).

L. Radek, The Admissibility of Polygraph Results in Criminal Trials: A Case for the Status Quo, 3 Loy.U.L.Rev. 289 (1972).

J. Richardson, *Modern Scientific Evidence* § 10.2 (2d ed. 1974).

J. Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L.J. 694 (1961).

sults into evidence. First, a guilty party who recognizes no responsibility to tell the truth might "beat the machine" and offer the erroneous results as proof of innocence. And second, an innocent party might submit to a polygraph examination with the hope of proving his innocence and obviating the rigors of a trial, only to find that erroneous results constitute the heart of the state's case against him. An innocent person convinced of the device's accuracy would not anticipate that his submission to the polygraph examination might produce an involuntary and erroneous admission of guilt.

■ For all the above stated reasons, polygraph examination results are unreliable evidence. That a defendant may have stipulated to their admissibility, whether to prove his innocence or to deceive the polygraph examiner into providing him with exculpatory evidence, or for whatever reason, does nothing to correct the problem of unreliability of this evidence.

■ Evidence of polygraph results raises another concern which cuts to the very heart of the jury system. Unlike other scientific evidence, which may be used to identify an individual or object allegedly involved in the perpetration of a criminal act, polygraph evidence purports to settle the sole issue reserved for the jury in a criminal case. *United States v. Alexander,* 526 F.2d 161, 168–69 (8th Cir. 1975). "To the extent that the polygraph results are accepted as unimpeachable or conclusive by jurors, despite cautionary instructions by the trial judge, the jurors' traditional responsibility to collectively ascertain the facts and adjudge guilt or innocence is preempted." *Ibid,* at 168. "There can be little question that from a jury standpoint, the polygraph test as interpreted by the expert is independent proof of what often are the most critical facts in the case, that is, the guilt of the defendant." *State v. Frazier, supra,* 252 S.E.2d at 47. The admission of such evidence and expert opinion permits the usurpation of the jury's function and deprives the defendant "of the common sense and collective judgment of his peers,

derived after weighing facts and considering the credibility of witnesses, which has been the hallmark of the jury tradition." *United States v. Alexander, supra,* 526 F.2d at 168. Moreover, it has long been the law in Missouri that "opinion testimony of expert witnesses 'should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved.'" *Sampson v. Missouri Pacific R. Co.,* 560 S.W.2d 573, 586 (Mo. banc 1978); *Benjamin v. Metropolitan St. Ry. Co.,* 133 Mo. 274, 34 S.W. 590, 593 (1896). The exclusion of the interpretation and results of polygraph tests would be in keeping with this principle, for it cannot be said that the jury is incapable of performing its duty to weigh the facts, consider the credibility of witnesses, and determine guilt or innocence. We will not be a party to doing anything to displace the jury in its constitutional role of determining whether or not the accused is guilty. We have always relied on the jury, made up of individuals with diverse backgrounds, viewpoints and knowledge, by use of its common sense and collective wisdom and judgment, to determine who is telling the truth and what the facts are. There is no place in our jury system for a machine or an expert to tell the jury who is lying and who is not.

■ We reaffirm our decision in *State v. Cole, supra,* and continue to hold that polygraph examination results lack wide scientific approval of their reliability and are inadmissible as evidence in the courts of this state. We reaffirm the statement in *State v. Fields, supra,* limiting that decision to the issue regarding a voluntary and intelligent waiver of a constitutional right against self-incrimination and we hold erroneous any interpretation of the *Fields* case which holds that polygraph evidence otherwise inadmissible for unreliability can be made admissible through a stipulation of the parties.

II

■ The second ground cited by the dissenting judge of the court of appeals for

certifying the case for transfer to this court, pertains to the sufficiency of the circumstantial evidence to support a conviction of first degree robbery. In its brief, the state concedes that "the present case is founded upon circumstantial evidence." The standard of review as to the sufficiency of the evidence in a case founded entirely upon circumstantial evidence is governed by *State v. Franco*, 544 S.W.2d 533 (Mo. banc 1976), *cert. denied* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977):

> " 'the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence.' . . . [Citations omitted] . . . [But] the circumstances need not be absolutely conclusive of guilt, and they need not demonstrate impossibility of innocence . . ."

544 S.W.2d at 534. However, if the evidence does not preclude a reasonable hypothesis of innocence, it is not sufficient to support a conviction. *State v. Hodges*, 575 S.W.2d 769, 772 (Mo.App.1978). It has long been the law in this state that " '[m]ere suspicion, however strong, will not supply the place of evidence when life or liberty is at stake.' " *State v. Bunton*, 453 S.W.2d 949, 953 (Mo.1970), *citing State v. Jones*, 106 Mo. 302, 17 S.W. 366 (1891).

The circumstantial evidence to prove defendant's complicity in the robbery, after excluding the results of the polygraph examination, is as follows: (1) six hours after the crime was committed, defendant, who had been drinking, was found lying in a roadside ditch approximately five miles from the robbery scene in an open area with better hiding places nearby; (2) the officer who arrested defendant believed that defendant exaggerated the amount and effect of the alcohol he had drunk that evening and was feigning drunkenness; (3) included in the $629.00 taken in the robbery was sixty to seventy dollars in coins, including two half-dollars bearing a bicentennial year commemoration and defendant had in his possession when arrested $22.50, all in coins, among which were two bicentennial half-dollars; and (4) defendant escaped from custody while awaiting trial. As noted earlier, the robbery victim could only identify the taller robber. She could not identify defendant as the shorter robber; she was unable to describe the shorter robber's clothing, characteristics, or race.

 The state contends that defendant's having been found lying in a ditch eight to ten feet from the highway was admissible as evidence of concealment under *State v. Cochran*, 366 S.W.2d 360, 362 (Mo.1963), *cert. denied*, 375 U.S. 981, 84 S.Ct. 492, 11 L.Ed.2d 426 (1964). In *Cochran*, the court permitted the testimony of the two arresting officers that the defendant was found hiding in a clothes closet to show defendant's attempt to evade arrest. The state's evidence in the case at bar, however, indicates that defendant was seen by the arresting officer even before he alighted from the patrol car. The other trooper testified that there were better hiding places nearby. Both officers testified that defendant made no attempt to resist arrest. In short, the facts did not demonstrate an effort by the defendant to hide or to evade arrest and his lying in the open ditch in an area with better hiding places nearby was not evidence of concealment under *Cochran*.

The state contends that defendant exaggerated the amount and effect of the alcohol he had drunk that evening and was feigning drunkenness. Trooper Hurt testified that he believed that defendant exaggerated the effect of his drinking by pretending to be intoxicated. The officers testified, however, that no attempt had been made to determine whether, in fact, defendant was intoxicated. No cases have been cited by the state, and we have found none, that hold that evidence of feigning intoxication, if sufficiently established, may supply an inference of guilt or be used as substantive evidence to support a conviction.

As set out above, under *Franco*, the facts and circumstances constituting the state's circumstantial evidence "must be inconsistent with his innocence and exclude every

reasonable hypothesis of his innocence." That defendant was found lying in a ditch and may have exaggerated the effects of his drinking falls far short of this standard.

■ The state argues that the fact that when arrested defendant had two bicentennial half-dollars and two bicentennial half-dollars were taken in the robbery is evidence potentially inconsistent with his innocence. In *State v. Hampton*, 275 S.W.2d 356 (Mo. banc 1955), the court addressed a similar question. There the issue involved a role of dimes:

"In our view, while the fact that a five-dollar roll of dimes, wrapped in the same colored paper as the missing roll, was the same day found in the possession of defendant was a circumstance admissible in evidence; nevertheless, inasmuch as there was no evidence sufficiently identifying the roll of dimes defendant had as that taken from the tavern, this circumstance was not substantial evidence inconsistent with a reasonable hypothesis of defendant's innocence."

275 S.W.2d at 358. In the case at bar, there was no evidence identifying the two coins as those taken from the victim.

The coinage of money is regulated by Congress. U.S.Const. art. I, § 8. Since 1963, pursuant to federal law, only half-dollars bearing on one side the likeness of the late president of the United States, John Fitzgerald Kennedy, have been coined.[12] These are the well-known Kennedy half-dollars. Also pursuant to federal law, the bicentennial commemoration first made its appearance on coins minted for issuance between July 4, 1975 and January 1, 1977.[13] Necessarily, therefore, the coins in question were Kennedy half-dollars bearing the bicentennial commemoration and there were millions of these coins in general circulation.[14] The point stressed by the state that the coins were bicentennial coins develops no more than the fact that such coins were among the millions of Kennedy half-dollars bearing the bicentennial commemoration in general circulation for at least two months prior to the September 9, 1975 robbery. Given the massive circulation of these coins, it cannot be said that possession by defendant of two such Kennedy half-dollars would logically lead to the conclusion that the coins had been stolen. It can be equally well explained as mere coincidence. Under *Hampton*, then, inasmuch as there was no evidence sufficiently identifying the two coins defendant had as those taken from the liquor store, this circumstance was not substantial evidence inconsistent with a reasonable hypothesis of defendant's innocence. All that the state's witnesses testified to about the coins could be true and yet defendant not be the second man in the holdup.

12. This court takes judicial notice of acts of Congress, *Rositzky v. Rositzky*, 329 Mo. 662, 46 S.W.2d 591, 599 (1931), even where the parties have not introduced them into evidence. *Twiehaus v. Rosner*, 362 Mo. 949, 245 S.W.2d 107, 110 (1952). Accordingly, we take judicial notice of the Act of December 30, 1963, Pub.L. No. 88–256, 77 Stat. 843, which provides:

"In lieu of the coinage of the 50-cent piece known as the Franklin half dollar, there shall be coined a silver 50-cent piece which shall bear on one side the likeness of the late President of the United States, John Fitzgerald Kennedy, and on the other side an appropriate design to be prescribed by the Secretary of the Treasury."

13. We take judicial notice of the Act of October 18, 1973, Pub.L. No. 93–127, § 2, 87 Stat. 455, which provides:

"Sec. 2 All dollar, half-dollar, and quarter dollar coins minted for issuance between July 4, 1975, and January 1, 1977, shall bear '1776–1976' in lieu of the date of coinage; and all dollar, half-dollar, and quarter-dollar coins minted thereafter until such time as the Secretary of the Treasury may determine shall bear a date emblematic of the Bicentennial in addition to the date of coinage."

14. Pursuant to the general rule that "[j]udicial notice in regard to congressional enactments is not limited to their existence, wording, and interpretation, but extends to all matters connected therewith," 29 Am.Jur.2d *Evidence* § 32 (1967); *see Twiehaus v. Rosner, supra*, (court on its own motion took notice of federal Housing and Rent Act of 1947 and of the regulations promulgated under the act), we take notice of the Department of the Treasury, Bureau of the Mint "Annual Report: Calendar Year Coinage Statement 1975–1976." According to the report, some 378,514,000 Kennedy half-dollars bearing the bicentennial commemoration were issued for general circulation between July 4, 1975 and December 31, 1975.

Likewise, the fact that defendant had $22.50 in coins in his possession at the time of his arrest is not substantial evidence inconsistent with a reasonable hypothesis of his innocence. The state's evidence was that $629.00 was taken in the robbery, over $550 in bills and some sixty to seventy dollars in coins. When arrested, defendant had no bills in his possession. The state's evidence proved only that defendant possessed $22.50 in coins and did not prove that the coins were stolen property nor place defendant at the scene of the robbery. This is not a case like *State v. Fields, supra,* where the defendant was found soon after and within the immediate vicinity of the robbery holding the same amount of money as that which was taken in the robbery. Consequently, that defendant had $22.50 in coins at the time of his arrest is not substantial evidence inconsistent with a reasonable hypothesis of his innocence. There are many ways by which a person could innocently have a pocket full of change.

The state also submitted as circumstantial evidence the fact that, while awaiting trial, defendant escaped from jail. We have held that evidence of a defendant's escape bears on the issue of his guilt of the charge on trial, *State v. Holt,* 465 S.W.2d 602 (Mo.1971), but that escape or flight is, of itself, insufficient to support a conviction. *State v. Castaldi,* 386 S.W.2d 392, 395 (Mo.1965). Defendant's escape from jail, then, is consistent with the hypothesis of his guilt but is of itself insufficient to support a conviction or to provide substantial evidence to exclude every reasonable hypothesis of his innocence.

As we have pointed out, none of the pieces of circumstantial evidence, standing alone, is sufficient to support a conviction. We are not unmindful the state is entitled to have the circumstances viewed as a whole and not piecemeal. Taking the facts and circumstances proved as a whole, however, the best that can be said when viewed collectively is that they raise a suspicion of guilt. This, however, does not avert the void of substantive evidence placing defendant at the scene of the crime.

As put by the court of appeals banc opinion herein: "The evidentiary efficacy of all of these fragmented bits and pieces of circumstantial evidence, because of their inconclusive nature and lack of any perceptible nexus, cannot be extrapolated by the state into substantive evidence to support the guilty verdict." Singularly or collectively, they are not "inconsistent with his innocence" and do not "exclude every reasonable hypothesis of his innocence", *State v. Franco, supra.* Such a modicum of evidence does not support proof of defendant's guilt beyond a reasonable doubt or overcome the presumption of innocence clothing the accused.

### III

Having decided that the polygraph results were erroneously admitted into evidence and that the remaining evidence was insufficient to support a conviction, we must decide whether to remand the case or to discharge the defendant. In *State v. Wood,* 596 S.W.2d 394 (Mo.1980), this court addressed the question whether retrial is permissible after a reversal of a conviction on the grounds of erroneously admitted evidence, when the evidence is insufficient to support a conviction without the erroneously admitted evidence. The court found that retrial was not proscribed by the double jeopardy clause as enunciated in *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), as the question was expressly left open by the Supreme Court in *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), decided concurrently with *Burks.* In *Woods* we held:

"When the trial court erroneously admits evidence resulting in reversal, as in the instant case, the State should not be precluded from retrial even though when such evidence is discounted there may be evidentiary insufficiency. The prosecution in proving its case is entitled to rely upon the rulings of the court and proceed accordingly. If the evidence offered by the State is received after challenge and is legally sufficient to establish the guilt of the accused, the State is not obligated

to go further and adduce additional evidence that would be, for example, cumulative. Were it otherwise, the State, to be secure, would have to assume every ruling by the trial court on the evidence to be erroneous and marshall and offer every bit of relevant and competent evidence. The practical consequences of this would adversely affect the administration of justice, if for no other reason, by the time which would be required for preparation and trial of every case. . . ."

596 S.W.2d 394. In the case at bar, the prosecution relied upon the several decisions of the court of appeals which misread the *Fields* case, discussed in detail above. It may be that the state, in reliance upon these cases, withheld additional evidence because it was cumulative. The cause, therefore, is remanded for new trial. If the state cannot produce additional evidence, the case should be dismissed.

Reversed and remanded.

BARDGETT, C. J., and DONNELLY and WELLIVER, JJ., concur.

HIGGINS, J., dissents in separate dissenting opinion filed.

RENDLEN and MORGAN, JJ., dissent and concur in separate dissenting opinion of HIGGINS, J.

HIGGINS, Judge, dissenting.

I would affirm the conviction in this case.

The majority opinion overrules prior case law in this state to hold as a prelude to its determination of evidentiary insufficiency, that results of polygraph examinations cannot be admitted into evidence under any circumstances including upon stipulation of the parties. No question of the admissibility of polygraph results upon stipulation of the parties was raised or preserved by the appellant, and no such question was briefed or argued before this Court. Whether the courts of Missouri should without exception exclude the results of polygraph examination should await a case in which such issue is properly presented.

The posture of this case is set by appellant's five points of error: 1) whether it was error to permit testimony that defendant possessed two bicentennial half-dollars when arrested after it was shown that two such coins were taken in the robbery; 2) whether a mistrial should have been declared following the sheriff's testimony that bicentennial half-dollars were scarce in the area; 3) whether the polygraph examiner's questions violated the terms of the stipulation and whether, therefore, his testimony should have been excluded; 4) whether there was evidence to support an instruction on defendant's responsibility for the robbery; and 5) whether there was sufficient evidence to sustain the conviction. In no way has appellant contended that the polygraph results should be excluded if obtained pursuant to a valid stipulation.

The certification of the case to this Court in the dissent of Pritchard, J., viewed the majority opinion in the court of appeals to be in conflict with Missouri law in three respects: first, that it misstated the circumstantial evidence rule set out in *State* v. *Franco*, 544 S.W.2d 533 (Mo.banc 1976) *cert. denied*, 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275; and misapplied that rule by finding insufficient evidence to support conviction; second, "there is no preservation of the point on appeal that the polygraph test should have been excluded, i.e. that it was inadmissible for any purpose, . . ."; third, that the majority opinion improperly treated as dicta the holding in *State* v. *Fields*, 434 S.W.2d 507 (Mo.1968), that the weight of polygraph results once admitted is the sole prerogative of the jury.

The foregoing statement of the issues presented demonstrates that appellant has not preserved as allegations of error or called upon this Court to consider as plain error that upon which the majority bases its holding; nor has the court of appeals raised such issue. In its posture this case is best determined the same as on original appeal, Rule 83.09. On the issues so presented the conviction should be affirmed.

Appellant's first charge is that it was highly inflammatory and prejudicial error

to permit testimony that defendant had two bicentennial half-dollars in his possession when he was arrested. He argues that the coins could not be identified as belonging to the victim and were therefore not connected to the robbery; and that testimony about them should have been excluded as irrelevant, of no probative value, and clearly prejudicial as it raised the inference that the coins were taken at the time of the robbery. Appellant would thus invoke the rule that money seized from a person accused of a crime involving theft of money cannot be admitted into evidence absent some showing that the seized money came from or had some connection with the robbery. *See, State v. Vernor*, 522 S.W.2d 312, 314–315 (Mo.App.1975), and cases there collected.

In *State v. Ball*, 339 S.W.2d 783 (Mo.banc 1960), defendant, convicted of armed robbery, charged error to the admission of testimony that he had $258.02 in cash on his person when arrested three weeks after the robbery. The court held that testimony concerning the money was irrelevant stating that:

> The mere possession of a quantity of money is in itself no indication that the possessor was the taker of money charged as taken, because in general all money of the same denomination and material is alike, and the hypothesis that the money found is the same as the money taken is too forced and extraordinary to be receivable.

*Id.* at 786.

To be relevant, the court continued, such testimony required as a precondition, "proof or . . . a fair inference from the record that the money in [defendant's] possession at the time of his arrest came from or had some connection with the robbery . . . ." The court found no such connection where there was no identifying item associated with the cash and three weeks had elapsed between the robbery and the arrest.

The necessary connection was found in *State v. Britt*, 504 S.W.2d 38 (Mo.1973). Armed robbers took $300.00 and made their getaway in a damaged car. Part of the money taken consisted of coins rolled in green wrappers. Two and a half hours later a green dime coin wrapper similar to one of those taken was found in the front seat of the damaged car in which defendant was arrested. The amount of money possessed by the car's occupants totalled $301.29 and the denominations of the currency corresponded to those taken in the robbery to the extent that none exceeded $20.00. The court found that in view of the green wrapper, the similarity of currency denomination, the close time element, and the connection of the damaged car and its occupants with the robbers, it was not irrelevant to show that the car occupants had in their possession a sum of money approximately the same as taken in the robbery.

In *State v. Hampton*, 275 S.W.2d 356 (Mo.banc 1955), defendant was convicted of larceny where thirty dollars in cash including a five dollar roll of dimes wrapped in green paper was taken. Defendant was arrested the same day and a roll of dimes in green paper was found on his person. The court held:

> a five-dollar roll of dimes, wrapped in the same colored paper as the missing roll, was the same day found on the person of defendant was a circumstance admissible in evidence.

*Id.* at 358.

Tested by the foregoing, the showing in this case that the change found on defendant included two distinctive coins similar to those taken in a robbery occurring six hours earlier and four or five miles away raised a fair inference that such coins were connected to the robbery. A sufficient connection established, testimony regarding the coins was relevant and no error was committed in its admission. *Compare, State v. Vernor, supra,* where it was error to admit evidence that $83.50 was found on defendant at the time of his arrest two days after a robbery in which $800.00 was taken absent evidence associating the money found on defendant with the robbery.

Appellant's next charge is that the court erred in refusal of a mistrial when Sheriff

Morris testified that defendant's possession of the two bicentennial half-dollars was unusual because, "[t]hey had recently been introduced into circulation and there were not too many of them around the Boonville area." Defendant's objection to this testimony was sustained. His request for mistrial was denied and the jury was instructed to disregard the comment. Appellant argues that the court's admonishment was not sufficient "to remove the taint from the minds of the jurors."

Mistrial is a drastic remedy to be exercised in those circumstances where the alleged prejudice can be removed in no other way. *State* v. *Parker*, 476 S.W.2d 513, 515–16 (Mo.1972). Mistrial was not required in this case because it was clear to the jury that the Sheriff was not purported to have expertise respecting coin circulation; and the substance of the objectionable statement was something the jurors likely knew from their own experience. In these circumstances the court's instruction to disregard the comment was a proper exercise of discretion. *Compare, State* v. *Wells*, 550 S.W.2d 793, 794–795 (Mo.App.1977).

Appellant next charges the court erred in failure to suppress all evidence related to the polygraph examination asserting that the stipulation governing the test and use of its results in evidence was violated in that the examiner "did not use the questions agreed upon in said stipulation" and "used certain questions not included or within the scope of the stipulation."

The STIPULATION AND AGREEMENT recited and provided:

" * * *

"2. That Thomas Woodrow Biddle after conferring with and receiving the legal counsel of his attorney, Dale Reesman, desired to be given a polygraph test concerning his participation in the herein alleged act of first degree robbery.

"3. That Thomas Woodrow Biddle's desire to take said polygraph test was his own, voluntary, idea and he has not been coerced, induced or pressured into such decision by any officer or agent of the State of Missouri.

"4. That the parties agree that Thomas Woodrow Biddle shall be given a polygraph (lie detector) test concerning his knowledge and/or participation in the aforesaid acts of robbery by Sgt. G. F. Payne of the Missouri State Highway Patrol, using the equipment of the Missouri State Highway Patrol located at the Headquarters of Troop F in Jefferson City, Missouri, and that said test shall include, but not be limited to the following type of question, to-wit:

I. *KNOWLEDGE QUESTIONS*:

A. Do you know who robbed the liquor store in Otterville?

B. Have you ever been to the Wagon Wheel Liquor Store in Otterville, Missouri?

C. Have you ever been to the Wagon Wheel Liquor Store with Ralph Dyke?

II. *DIRECT QUESTIONS*:

A. Did you assist in the armed robbery of the Wagon Wheel Liquor Store in Otterville on September 9, 1975?

B. Did you receive any of the money which was stolen from the Wagon Wheel Liquor Store in Otterville?

C. When you were arrested on September 10, 1975, along Highway No. 50 by the Missouri State Highway Patrol was any part of the money which you had on your person taken from the Wagon Wheel Liquor Store?

D. Are you withholding any information about the robbery of the Wagon Wheel Liquor Store?

III. *CONSPIRACY QUESTIONS*:

A. Did you plan with anyone to rob the Wagon Wheel Liquor Store in Otterville?

B. Have you told me the entire truth concerning the robbery of the Wagon Wheel Liquor Store in Otterville?

IV. *GENERAL QUESTIONS*:

A. Do you live in the United States?

B. Is your first name Tommy?

C. Are you forty years old?

"5. That the defendant, Thomas Woodrow Biddle, does hereby absolutely and irrevocably waive each and every ob-

jection, including, but not limited to the objections as to relevancy, materiality, competency, constitutionality, reliability, and self-incrimination, to the use in evidence at any stage of the prosecution of the herein described robbery charges of the results of the polygraph test.

"6. That the parties agree that Sgt. G. F. Payne should be permitted to testify, for either the State of Missouri or the defendant, at any stage of the herein described robbery proceedings about the polygraph test of Thomas Woodrow Biddle, including a description of the test, the equipment used in testing, the questions and answers asked and given, defendant Thomas Woodrow Biddle's responses as recorded and Sgt. Payne's conclusion drawn from the polygraph test, including the issue whether Sgt. Payne believed defendant Thomas Woodrow Biddle's answers were truthful or not."

Appellant's assertion that some of the questions asked by the examiner were outside the scope of questions permitted by the stipulation is refuted by specific provision in the stipulation that questions asked, "shall include, but not be limited to . . . ." Thus, use of questions not listed did not violate the terms of the stipulation.

Appellant would support his assertion that the examiner did not use some of the agreed questions by argument that all listed questions in the agreement were mandatory and the examiner's deviation from them rendered the agreement void. He contends that of twelve such questions, at least five were omitted, and substantial changes were made in three.

Had the intent of the parties been that the test include each of the listed questions, such could easily have been expressed. Instead, the parties stipulated the type of questions to be asked and provided examples for each of the four categories. Webster's Third New International Dictionary defines "type" as something that serves as a symbolic representation; a particular kind, class, or group. Listed as synonyms are "kind" and "sort". Thus it appears from the stipulation that the parties intended to provide the areas of inquiry by the examiner without specifying the exact questions to be used.

The record demonstrates that included in the questions actually used by the examiner were questions of each of the four types required by the stipulation. The expressed purpose of the parties was to obtain an expert opinion as to the truth of defendant's responses to questions "concerning his participation in the herein alleged act of first degree robbery." The stipulation should be interpreted in view of the result the parties intended to accomplish. *State v. Jones*, 539 S.W.2d 317, 318 (Mo.App.1975). The examination as conducted served this purpose and did so within the terms of the stipulation and agreement.

Appellant charges error in giving Instruction No. 5 (MAI–CR 2.10):

All persons are guilty who knowingly act together with the common purpose of committing an offense, or who, whether present or not, knowingly and intentionally aid or encourage another in committing it, and whatever one does in furtherance of the offense is the act of each of them.

The presence of a person at or near the scene of an offense at the time it was committed is alone not sufficient to make him responsible therefor, although his presence may be considered together with all of the evidence in determining his guilt or innocence.

Appellant argues that "since there was no substantial evidence of affirmative participation" by defendant, this instruction was not supported by evidence; and because there was no evidence that defendant was present at or near the scene of the robbery, the second paragraph of the instruction should have been omitted in accordance with Note 3, Notes on Use, MAI–CR 2.10.

This argument is resolved in the disposition of appellant's final contention that the evidence in this case is not sufficient to sustain the conviction. In this connection appellant asserts "there was no direct evidence of appellant's participation in the

robbery" and "no credible circumstantial evidence of [his] involvement" in that "the only evidence was appellant's testimony regarding the polygraph examination; the arrest of [defendant] on foot several miles from the scene, some five hours later" and "possession of two bicentennial half-dollars at the time of appellant's arrest." He argues that the place of arrest was consistent with his being stranded in the Otterville area and being in the process of walking home; he did not attempt to hide, although there were hiding places in the vicinity and he was lying in the roadside ditch because he was intoxicated; the change in his possession was consistent with some success in the poker game and his evening's start with some fifteen dollars in change given him by his father.

In a determination of the sufficiency of evidence to support conviction all evidence tending to support the verdict must be considered as true, contrary evidence disregarded, and every reasonable inference supporting the verdict indulged. Where the conviction rests on circumstantial evidence, the facts and circumstances to establish guilt must be consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of his innocence. In such cases the evidence need not be conclusive of guilt, nor must the evidence demonstrate the impossibility of innocence. *State v. Franco,* 544 S.W.2d 533, 534 (Mo. banc 1977), *cert. denied,* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275.

Viewed in accord with the foregoing, the evidence demonstrates a submissible case:

At approximately 8:30 p. m., two men actively participated in the robbery of the victim taking, among their loot, sixty to seventy dollars in change including two distinctive coins. Minutes later law officers arrived and in a short time an area wide search by police and private citizens aided by Citizen Band radios began. Later at 2:30 in the morning it was reported that defendant was seen entering a ditch four or five miles from the scene of the crime along the highway leading from the scene, and he was there discovered by the trooper. It could be inferred that defendant was attempting to conceal himself [1] and that when confronted by the trooper, he pretended to be drunk although he was not. In his possession was $22.50 in change including two distinctive coins identical to those taken some six hours earlier. While awaiting trial for this offense, defendant escaped from jail [2] and had to be brought back from the state of California to stand trial. When asked by a qualified polygraph examiner whether he participated in, had knowledge of, and received proceeds from the robbery, defendant gave negative answers which in the opinion of the examiner were deceptive. Taken together, these circumstances are a connected chain of events, consistent with each other, consistent with defendant's guilt, and inconsistent with any reasonable theory of defendant's innocence, including his own. These circumstances also support defendant's active participation and his presence at the scene of the robbery for purposes of Instruction No. 5 in form MAI–CR 2nd 2.10.

The majority has determined *sua sponte,* without contention or demonstration of manifest injustice or miscarriage of justice for purposes of relief of plain error under Rule 29.12(b), that polygraph results are not admissible under any circumstances including the valid stipulation to their admissibility in this case. This determination provides the basis for the conclusion that the evidence is insufficient to sustain conviction.

Case law in Missouri relieves of any necessity to resort to cases from foreign jurisdictions for resolution of the question thus posed.

In *State v. Fields,* 434 S.W.2d 507 (Mo. 1968), defendant was charged with armed robbery. He entered into a stipulation with

---

1. Evidence of concealment by a defendant is relevant on the issue of his guilt. *State v. Hamilton,* 569 S.W.2d 24 (Mo.App.1978).

2. Evidence of escape by a defendant bears on the issue of his guilt of the charge on trial, *State v. Holt,* 465 S.W.2d 602 (Mo.1971), the weight to be determined by the jury, *State v. Hudson,* 491 S.W.2d 1 (Mo.App.1973).

the State to take a polygraph test and specifically waived "absolutely and irrevocably each and every objection to the use in evidence by the prosecution of the results of the said test." The results, in the opinion of the examiner, indicated that defendant "was attempting deception on the questions that pertained to the offense" and that his "answers denying implication were deceptive answers." On appeal from his conviction, defendant challenged admission of the polygraph results on self-incrimination grounds. In affirming the conviction the court held:

> none of defendant's constitutional rights or privileges were infringed, under these circumstances, by the admission of this evidence. The weight of the evidence was solely for the jury, in the light of a most extensive cross-examination.

*Id.* at 515. The Court declined to rule upon the admissibility of polygraph evidence from the standpoint of the scientific acceptance or nonacceptance of the tests or their accuracy on the ground that in view of the stipulation by defendant waiving his objections,

> It would be almost unthinkable to permit defendant now to reverse his position and oppose the reception of this evidence for the sole reason the results were not favorable.

*Id.* at 513.

In *State v. Scott*, 570 S.W.2d 813 (Mo. App.1978), defendant was charged with common assault. Prior to trial he stipulated to take a polygraph test and to admissibility of the results. The test proved unfavorable to defendant and he was convicted. On appeal he challenged the trial court ruling which denied cross-examination of the polygraph expert as to the rationale behind the general rule that the results of a polygraph are not admissible. In affirming the conviction the court said,

> Absent the written stipulation entered into between defendant and the state, the results of the polygraph examination administered to the defendant would have been inadmissible as evidence because they lacked scientific support for their

reliability. *State v. Weindorf*, 361 S.W.2d 806, 811 (Mo.1962); *State v. Cole*, Mo., 188 S.W.2d 43, 51, motion den. 354 Mo. 181, 189 S.W.2d 541 (1945); and *State v. Jacks*, 525 S.W.2d 431, 435 (Mo.App. 1975). However, the written stipulation entered into between the parties gave the polygraph examination administered to defendant a legal aura of reliability, thereby infusing the conclusive results obtained with probative value.

*Id.* at 814–15.

In *State v. Mick*, 546 S.W.2d 508 (Mo. App.1976), defendant was convicted of first degree robbery. On direct examination defendant testified that prior to trial she had arranged to take a polygraph examination. On appeal the court held that once defendant had "opened the door" on the issue of the polygraph, it was not error for the State to inquire on cross-examination as to whether the test had ever taken place and what its results had been. Citing *State v. Fields, supra*, the court stated:

> It is the general rule in this state that the results of polygraph examinations are inadmissible as evidence because they lack scientific support for their reliability. . . . However anomalous it may be, the parties, by stipulation, may waive objections to the admission of polygraph examinations and their results, and in that sense imbue them with reliability and probative value.

In *State v. Ghan*, 558 S.W.2d 304 (Mo. App.1977), defendant was convicted of robbery. On appeal he attacked the scientific reliability of the polygraph test results entered into evidence by the State. The court held:

> In Missouri, by stipulation of the parties, polygraph evidence is admissible in a criminal trial. . . . While he knew he did not have to take the test, defendant requested he be given a polygraph exam. . . . Defendant's strategy backfired, and now he seeks to escape the stipulation by raising the scientific reliability objection. There was no failure by the state to fulfill its part of the bargain —defendant's only complaint is that his

hoped for result was destroyed by the test. Defendant cannot challenge testimony, the receipt of which was stipulated by him. . . . By requesting and agreeing to take the test and stipulating that the results would be received into evidence, defendant waived his objections to admissibility. . . .

*Id.* at 307–308.

Thus the law in Missouri has consistently held that irrespective of scientific reliability of polygraph examinations, the parties by stipulation, for reasons of their own, can make the results of such tests admissible. As part of that stipulation, either party may knowingly and intelligently waive any or all challenges to the conduct, reliability, and constitutionality of the test; and upon a finding that the stipulation is valid, the parties should not be permitted to renege on their agreement.

As demonstrated above, evidence of the circumstances surrounding the robbery, including the results of the polygraph examination, was sufficient to sustain defendant's conviction. Accordingly, and for the reasons stated, I cannot join the majority, and would affirm the judgment of conviction.