**Dee Ann BOLING, Appellant–Respondent,**

v.

**Dennis Ray BOLING, Respondent–Appellant,**

**D.R.B. & D.A.B.—minors, Defendants.**

**Dee Ann BOLING, Respondent,**

v.

**Dennis Ray BOLING, Appellant,**

**D.R.B. & D.A.B.—minors, Defendants.**

**Nos. WD 48399, WD 48428.**

Missouri Court of Appeals,
Western District.

Oct. 25, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 29, 1994.

John W. Ellinger, Jefferson City, for appellant.

Allan Brent Turner, Chillicothe, for respondent.

Michael B. Watkins, Chillicothe, guardian ad litem.

Before ULRICH, P.J., and
LOWENSTEIN and HANNA, JJ.

HANNA, Judge.

This appeal arises from mother's motion and father's countermotion to modify their decree of dissolution and addresses the admissibility of stipulated polygraph test results in a civil bench trial. The marriage of the parties was dissolved on September 23, 1991. There were two minor children born of the marriage, a son, born March 26, 1984, and a daughter, born April 18, 1989. The court awarded custody of the children to mother, subject to father's specific visitation rights.

Almost immediately after the dissolution, problems arose concerning visitation. Numerous motions to modify and motions for contempt were filed in the year following the divorce. Father's visitation was initially unrestricted and unsupervised. Later, his visitation was supervised by the Division of Family Services, then restricted in that he was forbidden to cohabitate with his future wife, Cindy Connor, during his visitation period, and most recently, subject to supervision by his parents at their home in Carrollton, Missouri.

In November 1992, mother again denied father visitation. On December 14, 1992, she filed an amended motion to modify which contained allegations that father and his new wife Cindy had physically and mentally abused the minor children during father's period of visitation. In that motion, she sought to terminate father's visitation or to have it supervised by Division of Family Services, and asked that father be held in contempt for violation of the previous court order. In January 1993, father filed an answer, a motion for contempt, and a countermotion to modify. His motion to modify requested expanded visitation and clarification of certain monetary matters concerning the children. It did not include a request for change of physical custody. Due to the allegations of abuse, the court appointed a guardian ad litem to represent the minor children.

In June 1993, the matter was tried before the court. The primary issue at trial was the truthfulness of the allegations of abuse contained in mother's motion. The parties do not dispute that in 1991 and 1992, the children suffered several injuries while in their father's custody. The injuries were all relatively minor, mainly consisting of cuts and bruises. The children were treated for these injuries by Dr. Gregory Sensenich, D.O. The children would be brought to the doctor's office by either their mother, their maternal grandmother, Ruth Wetzel, or Ms. Wetzel's friend, Frank "Sonny" Trager.

Dr. Sensenich testified at trial that the injuries received by the children were consistent with physical abuse. He stated, however, that his diagnosis was more speculative with regard to the sexual abuse alleged to have been perpetrated. Father and his wife both denied committing any abusive acts, physical or sexual.

There was also some dispute regarding father's alleged violation of the visitation order. A prior order stated that father was to have weekend visitation at the home of his parents, Gary and Betty Boling. After one weekend, mother testified that her children told her that their father had removed them from his parents' house in the middle of the night and taken them to his home in Blue Springs. The children also stated that father had stopped for gas and left the station without paying for it. Father testified, denying these allegations. Gary and Betty Boling also testified and denied any knowledge of his having taken the children from their home.

Because of the inconsistent stories, the court ordered that mother, father, father's wife, and the grandparents of the children submit to polygraph examinations to be conducted by the Missouri Highway Patrol. In its written order, the court described the reason for the examination to be an attempt to "make a factual determination as to the truthfulness of these allegations...." After the Attorney General filed a petition for writ of prohibition, the matter of the Highway Patrol was dropped. The Guardian Ad Litem then arranged for David LePage to perform examinations on mother, father, father's wife and father's parents, with the cost to be shared by the parties. Although examina-

tions were scheduled to be performed on Ms. Wetzel and Mr. Trager, they were never completed due to illness. The Guardian Ad Litem also asked Mr. LePage to test the son, but Mr. LePage refused due to the stress a polygraph examination could cause for a nine year-old child. Prior to taking the tests, the examinees signed a permission form which stated that they were taking the polygraph of their own free will.

Prior to trial, mother filed a motion in limine to exclude the test results and all testimony by Mr. LePage, based on the scientific unreliability of polygraph examinations. That motion was denied by the court. At trial, mother's counsel made a continuing objection to all polygraph evidence, which was overruled. Mr. LePage was permitted to testify about the results of the five examinations he had performed.

In mother's examination, Mr. LePage asked the four following "pertinent" test questions:

1. Have you had anything to do with the alleged sexual abuse of [son or daughter]?
2. Concerning this issue did you ever tell [son] anything you knew was not the truth?
3. Concerning this issue, did [son] ever tell you anything you knew was not the truth?
4. Did you ever tell [son] to repeat anything you knew was not the truth?

Mr. LePage testified that mother answered "no" to these four questions. He analyzed the results and stated that, in his opinion, she was not telling the truth with regard to questions 2, 3 and 4. Her response to question 1 was inconclusive, neither truthful or deceptive.

In the examination of father and his wife Cindy, Mr. LePage asked each subject the following questions:

1. Were you present when [daughter or son] were sexually assaulted? [1]
2. Did you ever sexually assault [daughter or son]?

3. Did you ever knowingly have sexual intercourse in front of [daughter or son]?
4. Did you ever touch [daughter's or son's] sex organs?

Both parties answered "no" to the questions. Mr. LePage testified that in his opinion they were telling the truth.

In the examination of Gary and Betty Boling, the paternal grandparents, Mr. LePage asked each testee the following:

1. Do you know for sure if [daughter or son] have ever been sexually abused?
2. The week-end of May 7th and 8th, did [father] take the children from your home?
3. Concerning this issue, did you ever tell [son] to repeat anything you knew was not the truth?
4. The week-end of May 7th and 8th, did you assist [father] in taking the children from your home?

Mr. and Mrs. Boling answered "no" to all four questions. In the opinion of Mr. LePage, they were telling the truth.

Although Mr. LePage was aware of the numerous instances of alleged physical abuse, none of the five examinations given included questions relating to physical abuse. He testified that after reading the reports which were submitted to him, he made the determination that the sexual abuse issue was the most important.

The Guardian Ad Litem testified at trial that, based on the polygraph results and what he perceived to be lies told by mother during her testimony, he recommended a change in physical custody of the two children.

At the conclusion of the hearing, the trial court ordered that physical custody be transferred to father and that he maintain counseling and therapy for both children. The order also contained a specific schedule of unrestricted visitation for the mother, with father to be responsible for transportation. The court determined that no child support

---

1. Although the report filed by Mr. LePage contained the phrase "sexually assaulted," he testified at trial that this was a typographical error and that in the actual examination he used the term "sexually abused" in questions 1 and 2.

or attorneys' fees would be awarded. Both parties appeal the judgment.

■ Mother raises three points of error in this appeal. However, her second point is determinative. In that point, she argues that the trial court erred in receiving into evidence the results of five polygraph examinations performed on mother, father, father's wife and father's parents.

The results of polygraph examinations have long been inadmissible in Missouri criminal trials because they lack scientific support for their reliability. *State v. Biddle*, 599 S.W.2d 182, 191 (Mo. banc 1980) ("[P]olygraph examination results lack wide scientific approval of their reliability and are inadmissible as evidence in the courts of this state."); *State v. Weindorf*, 361 S.W.2d 806, 811 (Mo. 1962); *State v. Cole*, 354 Mo. 181, 188 S.W.2d 43, 51 (1945). In *State v. Mahany*, 748 S.W.2d 762 (Mo.App.1988), the eastern district stated:

> [O]ur courts have never accepted, as a matter of law, the reliability of polygraph examinations. Our Supreme Court has enunciated reasons, which include: these tests are not uniformly sanctioned by the scientific community; they contain a high degree of interpretive subjectivity; they are not susceptible to in-court examination and testing; and they are subject to an inordinately high degree of reliance by juries.

*Id.* at 764 (*citing Biddle*, 599 S.W.2d at 187–90; other citations omitted). In addition, the Supreme Court noted that the polygraph will not detect the witness who makes honest misstatements of fact, and it may not detect the hardened individual who recognizes no responsibility to tell the truth. *Biddle*, 599 S.W.2d at 190. Another concern, articulated by the Michigan Supreme Court is that "the results of most polygraph examinations are not verified by extrinsic evidence, and there are no scientific studies performed by other than polygraphers which purport to demonstrate scientific means of verification." *People v. Barbara*, 400 Mich. 352, 255 N.W.2d 171, 189 (1977) (footnote omitted).

Father argues that there are several aspects of the present case which distinguish it from the cases citing the general rule of inadmissibility. First, father points out that *Biddle* was a criminal jury trial, while this is a civil judge-tried domestic dispute. Therefore, he argues, "the danger of prejudice is obviously diminished, if not eliminated."

While the danger of unwarranted reliance on the results by a jury may be eliminated, the fact that this is a civil, judge-tried case does nothing to alleviate the inherent unreliability and interpretive subjectivity of the test. In Missouri, the only cases discussing polygraph examinations are criminal. However, we find no reason why a different rule should be followed in civil cases tried before a judge. *See, e.g., Stone v. Earp*, 331 Mich. 606, 50 N.W.2d 172, 174 (1951); *M.N.D. v. B.M.D.*, 356 N.W.2d 813, 819 (Minn.Ct.App.1984); *Rutledge v. St. Paul Fire & Marine Ins. Co.*, 286 S.C. 360, 334 S.E.2d 131, 137 (Ct.App. 1985). It would be inconsistent to refuse evidence in a criminal jury trial and allow it in a civil bench trial, if the reason for its exclusion is its unreliability. The point is denied.

■ Next, father argues that the polygraph results are admissible because the parties stipulated to their admissibility prior to taking the examinations. The Missouri Supreme Court specifically addressed that issue in *Biddle*. Examining several appellate decisions to the contrary, the court held that parties cannot by stipulation make admissible evidence which would otherwise be held inadmissible for lack of scientific reliability. *Biddle*, 599 S.W.2d at 188, 191. The court noted that given the large margin of error stated by some experts, "a stipulation as to the admissibility of its results is, in effect, an agreement to rely upon chance rather than upon competent evidence, as well as an agreement regarding scientific opinion beyond the competence of either party to understand or evaluate." *Id.* at 190 n. 10. Even among those courts which have approved admissibility upon stipulation, there remains some doubt as to polygraph reliability, as illustrated by guidelines laid down to be used by the trial judge to assess the competency of the polygraph examiner and the reliability of the manner in which the test was conducted. 1 Wigmore, Evidence § 7a

(Tillers rev. 1983); *see, e.g., State v. Valdez,* 91 Ariz. 274, 371 P.2d 894, 900–01 (1962). We hold that polygraph examinations are not admissible in civil litigation, even though the parties may have stipulated to the admissibility of the examination and results.

■ Finally, there is the issue of whether admission of the polygraph results was prejudicial to mother. Father responds that any error in the admission of the polygraph results was harmless since there was other evidence at trial which could serve as the basis for the court's decision. He specifically cites: the inconsistent and untruthful testimony of the mother, the children and Ms. Wetzel; the inconsistencies between the children's versions of the events to the doctor and Division of Family Services' worker; and the fact that neither Dr. Sensenich, Dr. Easter (another physician who examined the children), nor the family services' worker could state with certainty that any sexual or physical abuse had taken place. While this evidence may support a finding that the abuse did not occur, it does not properly lead to the inference that the mother planted the accusations in the minds of the children in order to prevent visitation.

In its decree of modification, the court stated that since the dissolution, the two children "have not been assured of frequent and meaningful contact with both parents and have been effectively denied their rights to a continuing relationship with both parents." In his brief, father stated that "[mother's] conduct and its influence on the minor children, constitute a substantial and continuing change in the circumstances as required under § 452.410, RSMo Supp.1993."

The closing arguments of both the father and the Guardian Ad Litem referred repeatedly to the results of the polygraph examinations to support their theory that mother "brainwashed" and "programmed" the children to lie about the allegations of abuse against their father. Also, we observe that the initial order for a polygraph examination was on the court's own motion in that it would "be beneficial in determining the truthfulness of the allegations," which the court described as in substantial dispute. For these reasons we conclude that this case was tried on the polygraph tests to such a degree that we cannot say that the same result would have been reached without consideration of the test results. Therefore, the mother was prejudiced by the admission of the polygraph examination results.

The father complains that mother should have been required to pay child support and transportation expenses, which claims have been rendered moot by our order. Also, the point complains the mother should have been ordered to pay attorney fees.[2] With respect to the claimed error of failing to order mother to pay father's attorney fees, there was little, if any, evidence of a substantial nature to prove the amount of his attorney fees. He testified, "I would say about $10,000 would cover the whole thing." The father cites us to no further evidence. Recognizing that the court is capable of assessing attorney fees, there must be an evidentiary basis for an award. None was provided. Our review, pursuant to *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976), recognizes the substantial financial disparity between the parties' income and mandates upholding the trial court's ruling.

The judgment is reversed and the case remanded for retrial.

All concur.

─────────

2. There is no basis for an award of attorney fees pursuant to § 452.400.4, RSMo Supp.1993, because there was no finding by the court that it considered or decided the matter of unreasonable denial of visitation by the mother.