968 S.W.2d 214 (1998)
A.B.C., Plaintiff-Respondent,
v.
C.L.C., Defendant-Appellant.
No. 21468.
Missouri Court of Appeals, Southern District, Division One.
April 30, 1998.
*216 Kay A. Van Pelt, Van Pelt & Van Pelt, P.C., Springfield, for Defendant-Appellant.
William C. Love, Harrison, Tucker & Hyde, Springfield, for Plaintiff-Respondent.
Before GARRISON, P.J., and PREWITT and CROW, JJ.
PER CURIAM.
C.L.C. ("Mother") appeals from the trial court's judgment granting A.B.C. ("Father") primary physical custody of their minor child, E.D.C. ("Daughter"). This judgment was a modification of the trial court's original judgment in which it granted primary physical custody of Daughter to Mother.
Mother and Father, who have never been married, lived together before, and shortly after, the birth of Daughter on January 22, 1994. Father later filed an action to establish paternity and the rights of the parties with respect to Daughter. According to Father's testimony, this suit was preceded by a period of several months during which Mother denied him access to Daughter. On October 2, 1995, the trial court entered a judgment declaring Father to be Daughter's biological father, granting joint legal custody of her to Mother and Father, and granting primary physical custody to Mother, subject to Father's temporary custody rights.
Mother permitted Father access to Daughter according to the terms of the judgment until May 15, 1996. That morning, Father contacted Mother at work, and requested custody of Daughter for the day because his son and a friend were home from the military, and wanted to see her. Mother consented, and Father picked Daughter up at her day care center at 11:30 A.M. After having lunch at a local cafe, they went to Father's farm to spend the day. At 5:00 P.M., Father returned Daughter to the day care center where he remained with her until Mother arrived to take her home at about 5:20 P.M.
When they got home, Mother interrupted giving Daughter her bath to check a meal she was preparing, and asked her ten-year-old son, J.C., to watch Daughter for a few minutes. J.C. asked if he could get in the tub with Daughter, and Mother gave her permission. When Mother returned to the *217 bathroom, she removed Daughter from the tub, and began to dress her. As Mother was diapering Daughter, Daughter placed her finger between her legs, and said, "Owie. Daddy hurt me." Mother asked, "What did [Father] do?" Daughter responded, "Ow, ow, ow. Daddy hurt me." Mother also noticed a bruise in Daughter's genital area which had not been there that morning.
Later that evening, Mother reported the incident to the Division of Family Services (the "DFS"), whose personnel advised her to take Daughter to see Diane Arrowsmith, a nurse practitioner, the next morning. Ms. Arrowsmith performed a Sexual Assault Forensic Examination ("SAFE exam") on Daughter, and observed bruising and a small break in the skin on the child's perineum, the area between the rectum and vagina. She testified that this injury was "consistent with sexual abuse or assault," although she conceded that it could have resulted from nonsexual contact.
The DFS later interviewed Father as a part of its investigation. Father cooperated fully with the investigation, and denied that he had sexually abused Daughter. He stated that he was the only one who was alone with Daughter during the May 15, 1996 visit, and that he did not know how anyone could have "done anything to her" because she was never out of his sight. He changed Daughter's diaper once that day, but he did not notice anything unusual, nor did Daughter tell him that she was hurt in any way. The DFS concluded that Father "appear[ed] to be telling the truth concerning his innocence," but also determined that there was "probable cause" that Daughter had been sexually abused by an unknown perpetrator.
Apparently acting on the advice of a Juvenile Officer, Mother denied Father temporary custody of Daughter during the investigation. After the investigation ended, she continued to deny him any access to the child up to the time of trial. On October 11, 1996, Mother filed a motion to modify the October 1995 judgment, requesting that the trial court award her "primary physical and legal custody" of Daughter, and that Father's visitation with her be supervised. Father, citing Mother's interference with his temporary custody rights, filed a motion for contempt on October 15, 1996, and on October 23, 1996, he filed a counter-motion to modify, in which he asked for "permanent care, custody and control" of Daughter. The trial court appointed a guardian ad litem ("GAL") for Daughter, and held a hearing on November 12, 1996, during which it ordered the parties to follow the October 1995 judgment. Father's amended motion for contempt, in which he complained of Mother's continued disobedience of the October 1995 judgment, followed on December 6, 1996.
The trial court heard the case on January 8 and 13, 1997. Mother testified that she "believe[s] with all my heart" that Father sexually abused Daughter, and that she denied Father temporary custody of Daughter in order to protect her from further abuse. She stated that she had documented thirty-seven different occasions when Daughter, unprompted, said that Father had hurt her. Mother also presented several witnesses, including her mother, her sister, a family friend, and a therapist, who testified that Daughter had made statements to them such as, "Ow, ow, Daddy hurt me," "Daddy hurt me. Daddy naughty," "My daddy hurt me down there," "I tell [Mother's sister] my Daddy spank me," "Daddy hurt me bad," and "Daddy spank. Hurt me bad."
Father testified that he had not sexually abused Daughter, and that he doubted that she had been sexually abused at all. He stated that some animosity exists in his relationship with Mother, and that he thought it was possible that she prompted Daughter to make the allegation of sexual abuse. Citing Mother's conduct in preventing him from seeing Daughter before the October 1995 judgment, he suggested that she was again trying to alienate him from Daughter. Father's witnesses, including his wife, daughter, father, stepdaughter, and friend, testified that Daughter appeared to be happy and unafraid when she was with Father on May 15, 1996, and that they had never seen him behave inappropriately toward her.
The GAL, who had also served in that role in the proceedings leading to the October 1995 judgment, opined that Mother had failed to prove that Father had sexually *218 abused Daughter. He further stated that Mother's actions were "causing harm to the child by denying the child a relationship with her Father," and that this behavior was consistent with Mother's conduct prior to the October 1995 judgment. He recommended that the parties continue to have joint legal custody of Daughter, that Mother remain her primary physical custodian, and that Father have "expanded, set, enforceable visitation rights."
The trial court found that Mother's belief that Father sexually abused Daughter was genuine, but that no credible evidence substantiated it, and that she had not borne the burden of proof as to her motion to modify. It noted that the injury to Daughter may have been caused by sexual abuse or by some other cause, but that there was "no credible evidence that Father was responsible for the injury." The court observed, however, that "Mother has finally succeeded in convincing this Court that she has no intentions of allowing the child to have a proper relationship with the Father and is willing to go to any lengths to prevent visitation." It found that Mother's conduct in denying Father visitation constituted a substantial and continuing change in circumstances that compelled modification of the October 1995 judgment. It then ordered that the parties continue to hold joint legal custody of Daughter, but awarded primary custody to Father, subject to Mother's temporary custody rights.
Mother strenuously attacks the trial court's judgment, raising five points on appeal. In her first, she argues that the trial court erred in holding her in contempt of court. She refers to the following finding of fact in the trial court's decision:
Mother has wilfully and intentionally refused Father his temporary custody and visitation rights with the minor child which constitutes a deliberate violation of the [October 1995 judgment]. While the Court does not find the Mother's actions in refusing visitation from May 15, 1996 to November 12, 1996 to be in contempt of court, the Court does find her actions in refusing visitation after November 12, 1996 to constitute contempt. Since the Court's action on the Counter-motion to modify will make it unlikely that the contempt action will arise again, the Court declines to order any punishment to the Mother for her actions in contempt of court.
Although the trial court found that Mother's conduct after November 12, 1996 constituted contempt, it specifically declined to punish her.[1] It is well-settled that "error without prejudice is no ground for reversal." Gage v. Morse, 933 S.W.2d 410, 420 (Mo.App. S.D. 1996); Taylor v. Taylor, 908 S.W.2d 361, 363 (Mo.App. W.D.1995); Benton v. City of Rolla, 872 S.W.2d 882, 886 (Mo.App. S.D.1994). Mother contends nonetheless that the trial court's finding has prejudiced her, because "the order itself may have an effect on future adjudication and more importantly the presence or absence of a contempt finding bears on the trial court's order regarding change of custody." She does not explain how or to what extent this finding might affect her rights. She likewise fails to direct us to any part of the record showing that the trial court's contempt finding influenced its judgment modifying custody in any way. We will not reverse the trial court's judgment unless we find that its error materially affected the merits of the action. Gage, 933 S.W.2d at 420. Even if, as Mother argues, the trial court did err in holding her in contempt, she has not demonstrated that she suffered prejudice as a result, or that the contempt finding affected the outcome of this case. Accordingly, we deny Mother's first point.[2]
*219 Mother's remaining points relate to the trial court's judgment denying her motion to modify the October 1995 judgment and granting a similar motion filed by Father. In her second, third, and fourth points, she contends that its decision is unsupported by substantial evidence, is against the weight of the evidence, and is an abuse of discretion.
This court will sustain the judgment of the trial court unless no substantial evidence supports it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Murphy v. Carron, 536 S.W.2d 30, 32 (Mo.banc 1976). We will set aside a judgment as against the weight of the evidence only with caution and with a firm belief that it is wrong. Id. Mindful that the trial court is in a better position to evaluate the credibility of witnesses, we recognize that it is free to believe all, part, or none of the testimony of any witness. T.B.G. v. C.A.G., 772 S.W.2d 653, 654 (Mo.banc 1989).
We review the trial court's custody determination with the presumption that it awarded custody in the child's best interests. In re Marriage of Sisk, 937 S.W.2d 727, 730 (Mo.App. S.D.1996). The trial court has broad discretion in determining the custody of a minor child, and we will not disturb its award unless it is manifestly erroneous and the child's welfare requires some other disposition. Id., In re Marriage of Patroske, 888 S.W.2d 374, 383 (Mo.App. S.D.1994). We will not substitute our judgment for that of the trial court so long as credible evidence supports the trial court's beliefs. Patroske, 888 S.W.2d at 384.
Before it can modify a custody award, the trial court must find that a change has occurred in the circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child. § 452.410.1.[3] The burden of proving the change in circumstances is on the party seeking the modification. Moore v. Moore, 849 S.W.2d 652, 655 (Mo.App. W.D. 1993). It is public policy in Missouri to encourage the continued interest, love, and affection of both parents for their children, and to afford children ample opportunity for close contact with both of them. Jones v. Jones, 902 S.W.2d 363, 365-66 (Mo.App. E.D. 1995). Hence, one parent's interference with other's decretal rights of visitation constitutes a changed condition that may require a modification of a prior custody award. Cornell v. Cornell, 809 S.W.2d 869, 873 (Mo.App. S.D.1991). Similarly, one parent's attempts to alienate the child from the other parent is also a changed condition that can form the basis for a modification. Wilson v. Sullivan, 922 S.W.2d 835, 837 (Mo.App. E.D.1996). Modification of a custody decree under these circumstances may be necessary because such behavior demonstrates an attitude that the offending parent is not acting in the best interests of the child. Knoblauch v. Jones, 613 S.W.2d 161, 167-168 (Mo.App. S.D.1981).
In the instant case, Mother contends that trial court erred in transferring primary physical custody of Daughter to Father, because *220 the weight of the evidence indicated that Daughter was sexually abused by Father, or that the abuse occurred while she was in his custody. She claims that her own testimony and that of her witnesses, the timing of Daughter's injury, the SAFE exam, and the DFS report all support her story. We note first that the trial court was not obligated to believe Mother or any of her witnesses. T.B.G., 772 S.W.2d at 654. The timing of the injury does indicate that it could have occurred while Daughter was in Father's custody, but it does not compel that conclusion. While Mother places great emphasis on the results of the SAFE exam, it revealed only that the injury was "consistent with sexual abuse or assault," not that sexual abuse or assault actually caused it. See K.S.H. v. D.J.H., 891 S.W.2d 144, 148 (Mo. App. E.D.1995). Finally, the DFS report stated expressly that Father "appear[ed] to be telling the truth" in denying that he had harmed Daughter, and found only that probable cause existed to believe that she had been sexually abused.
Father's evidence, which Mother does not attack, supports his version of events while he had custody of Daughter, and his denial that he had hurt Daughter. Moreover, Mother freely admitted that she had denied him any contact with Daughter from May 15, 1996 until the time of trial, and that she did not know whether she would obey a court order to allow Father unsupervised contact with Daughter.
The trial court found that Mother's belief that Father sexually abused Daughter was genuine and sincere. She argues that this belief justifies her denial of Father's temporary custody rights, and precludes this court from affirming the trial court's modification on this basis. She cites no authority for this contention, and our research has revealed none. While we do not seek to belittle her allegations or to minimize their seriousness, we cannot ignore that any evaluation of them depends heavily on the credibility of the witnesses who attested to Daughter's statements, described Father's behavior toward Daughter, and recounted the events surrounding Daughter's injury. The trial court had the opportunity to hear this testimony and observe the demeanor of these witnesses, and consequently was in a far better position than this court to assess their credibility. See Patroske, 888 S.W.2d at 383. We cannot say that the trial court's disbelief of Mother's claims, and its award of primary physical custody of Daughter to Father was unsupported by substantial evidence, was against the weight of the evidence, or was an abuse of discretion. Mother's second, third, and fourth points are denied.
In Mother's fifth and last point, she argues that the trial court erred in admitting the DFS report because it contained the results of a polygraph examination administered to Father. This exhibit was offered by Mother, and admitted with the parties' stipulation that the trial court would not consider the polygraph evidence contained therein. Mother correctly points out that polygraph examinations and their results are not admissible in civil litigation proceedings, even if the parties stipulate to their admission. Boling v. Boling, 887 S.W.2d 437, 441 (Mo.App. W.D.1994). However, in a judgetried case such as the instant one, the trial court has wide latitude in the admission of evidence, because it presumably will not give weight to incompetent evidence. State ex rel. Missouri Highway & Transp. Comm'n v. Quiko, 923 S.W.2d 489, 498 (Mo.App. S.D. 1996). Trial court error in admitting evidence is not prejudicial unless the trial court relied on that evidence in arriving at its findings. Gardner v. Robinson, 759 S.W.2d 867, 868 (Mo.App. S.D.1988). Such errors will not result in a reversal in the absence of a substantial and glaring injustice. Quiko, 923 S.W.2d at 498. See also Ellis v. Ellis, 747 S.W.2d 711, 716 (Mo.App. W.D.1988).
Here, Mother asserts that the trial court "cannot be expected to be able to disregard" the polygraph evidence, but does not explain why that is so. Nor does she refer us to any part of the trial court's decision indicating that it relied on this evidence. We find no error in the trial court's admission of the DFS report, let alone a substantial and glaring injustice. We deny Mother's fifth point.
The judgment of the trial court is affirmed.
NOTES
[1] The trial court did not indicate, and we cannot determine, whether the contempt it found was civil or criminal in nature. There is no right of appeal from a judgment of criminal contempt. Ex Parte Ryan, 607 S.W.2d 888, 892 (Mo.App. S.D.1980). The distinction between civil and criminal contempt is reflected in whether the remedy is coercive or punitive. City of Springfield v. Weatherwax, 846 S.W.2d 206, 207 (Mo. App. S.D.1992). Here, the trial court imposed no remedy.
[2] We are cognizant of the principle that a contempt order that fails to provide for punishment is not final and appealable. See, e.g., Wrob v. Watlow Elec. Mfg. Co., 878 S.W.2d 63, 65 (Mo. App. E.D.1994); Muegler v. Muegler, 784 S.W.2d 839, 841 (Mo.App.E.D.1990). In the instant case, however, the trial court expressly dealt with the issue of punishment in its judgment, even though it declined to order any remedy. This is distinguished from Walton v. Walton, 789 S.W.2d 64, 67 (Mo.App. W.D.1990), in which the trial court found a man in "technical contempt" of an earlier order to pay temporary maintenance, but held that "this court perceives no purpose being served by seeking to employ any sanctions for husband's non-compliance through this date," and overruled the wife's motion for contempt. Thereafter, the wife filed another motion for contempt, which the trial court sustained and then ordered the husband jailed. On appeal, the husband contended that the earlier ruling on the contempt motion constituted collateral estoppel and prevented the issue of contempt for nonpayment from being relitigated. The appellate court disagreed, noting that in the earlier order holding husband in contempt, it was found that there was no purpose in punishing him "through that date." The ruling in the instant case contained no such limiting language. In Muegler, 784 S.W.2d at 841, the trial court found a father "in indirect civil contempt" for failure "to meet his obligations under the dissolution decree," but also found that "there was no evidence to show that father can presently pay any of the amounts ordered and `therefore, the Court sees no purpose in imposing any punishment upon [father] since he cannot purge himself from said punishment at this time,'" implying that any further contempt might be punishable in the future. The appellate court found that there was no final judgment because the order did not provide for any enforcement or punishment for the contempt found. Muegler is also distinguishable from the instant case, because the trial court here unconditionally declined to punish Mother.
[3] All statutory references are to RSMo 1994.